**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE NUTRASWEET COMPANY, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case No. 05-318 (SLR) |
|  | ) |
| AJINOMOTO CO., INC., | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT AJINOMOTO CO., INC.'S MOTION TO DISMISS</u>**

Dated: June 24, 2005

Co-Counsel:

| CLEARY GOTTLIEB | POTTER ANDERSON & CORROON, LLP |
|---|---|
| STEEN & HAMILTON, LLP | Peter J. Walsh, Jr. (DSB ID No. 2437) |
| Matthew D. Slater, Esquire | 1313 North Market Street |
| Patricia M. McDermott, Esquire | Post Office Box 951 |
| Ilya Shapiro, Esquire | Wilmington, Delaware 19899-0951 |
| 2000 Pennsylvania Avenue, N.W. | (302) 984-6037 |
| Washington, D.C. 20006-1801 | pwalsh@potteranderson.com |
| (202) 974-1500 |  |
| mslater@cgsh.com | *Attorneys for Defendant* |
| pmcdermott@cgsh.com | *Ajinomoto Co., Inc.* |
| ishapiro@cgsh.com |  |

68799v1/29191

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ....................... 1

SUMMARY OF ARGUMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT ............................................................................................................... 10

I.  NUTRASWEET'S COMPLAINT SHOULD BE DISMISSED
    FOR LACK OF SUBJECT MATTER JURISDICTION UNDER
    THE DECLARATORY JUDGMENT ACT ......................................... 10

    A.  NutraSweet Cannot Establish An 'Actual Controversy' As
        Required By U.S.C. § 2201 ......................................................... 11

        1.  NutraSweet Has Not Alleged and Cannot Demonstrate
            an Express Threat of Infringement, Termination,
            or Suit.................................................................................... 14

        2.  Ajinomoto's Previous Litigation With Daesang
            Does Not Create an Objectively Reasonable Basis
            for Apprehension of Suit....................................................... 15

        3.  The Totality of Circumstances, Including the Parties'
            History of Amicable Negotiations Under the License
            Agreement, Negates Any Objectively Reasonable
            Apprehension of Termination of Suit .................................. 19

II.  THIS COURT SHOULD, IN ANY EVENT, EXERCISE ITS
     DISCRETION TO DECLINE TO CONSIDER NUTRASWEET'S
     PREMATURE CLAIM FOR A DECLARATION OF RIGHTS
     UNDER THE LICENSE AGREEMENT ............................................. 20

CONCLUSION........................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                              **Page(s)**

*Apotex, Inc. v. Pfizer Inc.,* 04 Civ. 2539, 2004 U.S. Dist. LEXIS 26232
  (S.D.N.Y. Dec. 30, 2004)................................................................................... 19

*Arrowhead Indus. Water, Inc. v. Ecolochem Inc.*, 846 F.2d 731 (Fed. Cir. 1988) ......13, 18

*BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975
  (Fed. Cir. 1993)................................................................................................ *passim*

*Cygnus Therapeutic Sys. v. ALZA Corp.*, 92 F.3d 1153, 1160 (Fed. Cir. 1996),
  overruled *in part on other grounds by Nobelpharma AB v. Implant
  Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998)............................................13, 14

*Davox Corp. v. Digital Sys. Int'l, Inc.,* 846 F. Supp. 144 (D. Mass. 1993) ..................... 22

*DuPont Dow Elastomers v. Greene Tweed*, 148 F. Supp. 2d 412
  (D. Del. 2001) ................................................................................................16, 18, 19

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)...................................2, 21, 22

*Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376 (Fed. Cir. 2004) ......................11, 12, 14, 15

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953 (Fed. Cir. 1987)....... 19

*Gould Elecs., Inc. v. United States*, 220 F.3d 169 (3d Cir. 2000)................................... 12

*Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985) .....12, 13, 16

*Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207 (7th Cir. 1980)............................... 16

*Int'l Med. Prosthetics Research Assocs., Inc. v. Gore Enter. Holdings, Inc.,*
  787 F.2d 572 (*Fed. Cir. 1986)* ........................................................................... 11

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941) ............................. 11

*Medimmune, Inc. v. Centocor, Inc.*, No. 04-1499, 2005 U.S. App. LEXIS 9965
  (Fed. Cir. June 1, 2005) ...................................................................................11, 12

*Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977) .................12
*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051
  (Fed. Cir. 1995)................................................................................................13, 20

**Page(s)**

*Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324
    (Fed. Cir. 2005) .......................................................................................... *passim*

*TorPharm, Inc. v. Pfizer, Inc.*, No. 03-990-SLR, 2004 U.S. Dist. LEXIS 11930
    (D. Del. Jun. 28, 2004), *vacated as moot sub nom Apotex Inc. v. Pfizer
    Inc.*, No. 04-1463, U.S. App. LEXIS 5930 (Fed. Cir. Apr. 11, 2005)
    (per curiam) .......................................................................................... *passim*

*West Interactive Corp. v. First Data Res. Inc.*, 972 F.2d 1295
    (Fed. Cir. 1992) ........................................................................... 14, 15, 16

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) .......................................... 20, 21

*Wright Med. Tech., Inc. v. Osteonics Corp.*, 914 F. Supp. 1524
    (W.D. Tenn. 1995) ........................................................................ 13, 14, 17


**Statutes**

28 U.S.C. § 2201 ................................................................................. 1, 10, 21

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Plaintiff NutraSweet Co. ("NutraSweet") filed the instant action against Ajinomoto Co., Inc. ("Ajinomoto") on May 20, 2005.  NutraSweet seeks a declaratory judgment that any sale into Europe and certain other countries by it of the artificial sweetener aspartame produced in Korea in accordance with a particular manufacturing process does not constitute a breach of the May 25, 2000 Release and License Agreement ("License Agreement") between the parties and that Ajinomoto may not terminate the License Agreement as a result of any such sale.  (Complaint for Declaratory Judgment filed May 20, 2005 ("Compl. D.I. 1") ¶¶ a, b.)

Pursuant to a stipulation entered by the parties and ordered by the Court, the deadline for Ajinomoto's response to NutraSweet's Complaint was extended to June 24, 2005.

By way of response, Ajinomoto hereby submits this motion to dismiss NutraSweet's Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## SUMMARY OF ARGUMENT

1.    This Court lacks subject matter jurisdiction because NutraSweet cannot satisfy its burden of establishing an "actual controversy" as required by the Declaratory Judgment Act, 28 U.S.C. § 2201.  Specifically, NutraSweet has not identified nor could it demonstrate any express or implied threat or other action by Ajinomoto creating a reasonable apprehension that Ajinomoto will terminate the License Agreement or enforce its intellectual property rights against NutraSweet, which is a prerequisite for a declaratory judgment action.  *See, e.g., BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993).  Moreover, the extensive history of negotiated and consensual

amendments and side agreements to the License Agreement between the parties flatly negates any such allegation.  Indeed, NutraSweet seeks nothing more than an advisory opinion from this Court regarding the scope of the Licensing Agreement to guide its future commercial dealings.  This is an entirely impermissible use of the Declaratory Judgment Act.  Based on its wholesale failure to establish a "reasonable apprehension" of termination of the License Agreement or of a possible infringement suit, NutraSweet fails to meet a core jurisdictional requirement for maintaining an action under the Declaratory Judgment Act and the Court should dismiss the Complaint.

2.    Alternatively, even if NutraSweet were able to establish the jurisdictional requirements for declaratory relief, this Court should exercise its discretion to decline to consider this premature claim.  In the absence of any threatening conduct by Ajinomoto, and in light of the history of consensual resolution of the parties' affairs, "the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute."  *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 814 (Fed. Cir. 1996).

## **STATEMENT OF FACTS**

In accordance with the standards governing motions to dismiss for lack of jurisdiction, the following factual background is taken from the Complaint and its attached exhibits, documents to which the Complaint refers or incorporates by reference, the Declaration of Yasushi Tomioka ("Tomioka Decl.") and its attached agreements and communications between the parties filed herewith, upon which this Court may properly rely.

NutraSweet and Ajinomoto both manufacture and sell aspartame, a type of artificial sweetener. (Compl. D.I. 1 ¶ 2.) Ajinomoto holds numerous patents and certain proprietary know-how pertaining to the production of aspartame. (Tomioka Decl. ¶ 3.) NutraSweet sells its aspartame sweetener product under a brand bearing the same name, "NutraSweet." (Compl. D.I. 1 ¶ 14.) Ajinomoto has been involved in various aspartame licensing agreements, supply agreements, and joint ventures with NutraSweet or its predecessor companies since 1970. (Tomioka Decl. ¶ 3.)

On May 25, 2000, Ajinomoto and NutraSweet entered into a Release and License Agreement ("License Agreement") that, in relevant part, granted to NutraSweet a "perpetual, irrevocable, royalty-free non-exclusive license and right" to use certain of Ajinomoto's "Patents and Know-How" to manufacture and sell aspartame. (Compl. D.I. 1 ¶¶ 3, 17; License Agreement § 2.1, attached to the Tomioka Decl. as Ex. A; Tomioka Decl. ¶ 4.) The intellectual property rights covered by the License Agreement include over 150 United States and Canadian patents and patent applications held by Ajinomoto, along with all of their foreign counterparts, and know-how regarding the manufacture of aspartame and L-Phenylalanine owned by Ajinomoto and utilized by NutraSweet at its Augusta, Georgia facility as of the effective date of the Agreement. (Compl. D.I. 1 ¶ 18; License Agreement § 1(6) and Exs. A and A-2; Tomioka Decl. ¶ 5.) This "license and right" to make, use, or sell aspartame employing the identified Ajinomoto intellectual property extends worldwide, except for an "Excluded Territory" consisting of countries listed in Exhibit B to the License Agreement (including the European Union and certain other countries). (Compl. D.I. 1 ¶¶ 3, 17; License Agreement § 2.1.; Tomioka Decl. ¶ 4.)

The License Agreement prohibits NutraSweet's export of aspartame manufactured using the licensed Patents and Know-How to the Excluded Territory. (Compl. D.I. 1 ¶¶ 3, 19; License Agreement § 2.3.)

Ajinomoto has a history of fair and reasonable dealing with NutraSweet when faced with potential differences involving interpretation of or performance under the License Agreement. Since execution of the License Agreement over five years ago, the parties have addressed amicably issues arising from certain shipments of aspartame into Europe by NutraSweet. (Tomioka Decl. ¶¶ 6-8.) In fact, in correspondence exchanged during the course of negotiations over such shipments, NutraSweet's General Counsel observed, "NutraSweet and Ajinomoto have always been able to resolve their differences and maintain the good relationship that exists." (Letter from Bowman to Kono of 2/28/02, at 2; Tomioka Decl. ¶ 8, Ex. C.) In addition, NutraSweet has sought, and Ajinomoto has granted, numerous exceptions to the License Agreement to permit its otherwise prohibited sale of aspartame into the Excluded Territory. (Tomioka Decl. ¶¶ 9-13.) In each instance, Ajinomoto discussed the issue with NutraSweet and negotiated a mutually acceptable solution without resort to legal action. (Tomioka Decl. ¶ 14.)

For example, in early 2001, Ajinomoto became concerned that aspartame manufactured using its Patents and Know-How was being exported to the Excluded Territory, either directly or through a third party. (Tomioka Decl. ¶ 6.) A subsequent investigation by Ajinomoto revealed evidence of several apparent violations of the License Agreement by NutraSweet. (*Id.*) Notwithstanding this information, Ajinomoto neither terminated the License Agreement nor resorted to litigation. (Tomioka Decl. ¶ 8.) Rather, Ajinomoto requested a meeting with NutraSweet to discuss Ajinomoto's

concerns. (Tomioka Decl. ¶ 7.)   The parties thereafter exchanged information and engaged in a series of meetings and negotiations over a six-month period. (*Id.*)

As a result of these negotiations, on May 1, 2002, Ajinomoto and NutraSweet entered into a Letter Agreement ("Letter Agreement") that supplemented and amended the License Agreement. (*See* Compl. D.I. 1 ¶ 19; Letter Agreement, attached to Tomioka Decl. as Ex. B; Tomioka Decl. ¶ 7.)   In the Letter Agreement, NutraSweet agreed, in relevant part, that it would not "(a) itself export or (b) knowingly indirectly export, participate in the export, or cause or induce others to export" aspartame covered by the License Agreement to the Excluded Territory.   (Compl. D.I. 1 ¶ 19; Letter Agreement ¶ 3; Tomioka Decl. ¶ 7.)   Accordingly, the matter was resolved amicably without resort to termination of the License Agreement and without a lawsuit.

In addition, when Cadbury France (located in the Excluded Territory) requested encapsulated aspartame from NutraSweet, Ajinomoto on numerous occasions granted permission orally and by letter agreement for NutraSweet to supply Cadbury notwithstanding the restrictions under the License Agreement. (Tomioka Decl. ¶¶ 9-10; Letter from Steffen to Schulthess of 7/26/01, attached to Tomioka Decl. as Ex. D; Letter from Petray to Tomioka of 5/29/02, attached to Tomioka Decl. as Ex. E.)   Between January 2001 and August 2002, NutraSweet shipped as much as 8,800 kilograms of encapsulated aspartame to Cadbury in Europe under these arrangements.   (Tomioka Decl. ¶ 11; Letter from Petray to Tomioka of 6/19/02, attached to Tomioka Decl. as Ex. F; Memorandum Agreement of 8/1/02, at 3, attached to Tomioka Decl. as Ex. G (the "2002 Cadbury Memorandum").)

Subsequently, Ajinomoto amicably negotiated at NutraSweet's request a Memorandum Agreement formalizing the arrangements to permit otherwise prohibited sales of encapsulated aspartame to Cadbury. (Tomioka Decl. ¶ 12, Ex. G; 2002 Cadbury Memorandum.)

In 2003, NutraSweet further sought to sell encapsulated aspartame to another customer located in the Excluded Territory. (Tomioka Decl. ¶ 13; Memorandum Agreement of 12/1/03, attached to Tomioka Decl. as Ex. H (the "2003 Memorandum Agreement").) Ajinomoto again entered into a Memorandum Agreement with NutraSweet, this time extending the exception to permit NutraSweet's sale of encapsulated aspartame to any customer in European Union member countries. (Tomioka Decl. ¶ 13, Ex. H; 2003 Memorandum Agreement ¶ 2(1).)

In each of these prior instances, Ajinomoto has not invoked its right to terminate the License Agreement and has avoided litigation with NutraSweet. (Tomioka Decl. ¶ 14.) Indeed, Ajinomoto has never initiated litigation against NutraSweet or its predecessor companies relating to the various aspartame licensing agreements, supply agreements, or joint ventures between them in the 35-year history of relations between the parties. (*Id.*)

In or about April 2003, NutraSweet acquired from Daesang Corporation ("Daesang") certain manufacturing facilities and intellectual property located in Gunsan, Korea. (Compl. D.I. 1 ¶ 5; Tomioka Decl. ¶ 15.) The acquired assets include a process for manufacturing aspartame (the "Daesang Process"), which Daesang had been using to export product to Europe and elsewhere. (Compl. D.I. 1 ¶ 5.)

Without warning, NutraSweet filed the instant action against Ajinomoto on May 20, 2005, the very same day NutraSweet alleges it accepted a purchase order from a European customer for the delivery of aspartame into the Czech Republic (the "European Customer"). (Compl. D.I. 1 ¶¶ 25, 26.) NutraSweet contends that it plans to fill the purchase order, and other unspecified future orders from customers in the Excluded Territory, with aspartame manufactured in Korea using the Daesang Process. (Compl. D.I. 1 ¶¶ 27, 28.) NutraSweet now seeks a declaratory judgment that any sale into the Excluded Territory of aspartame manufactured in Korea in accordance with the Daesang Process does not constitute a breach of the License Agreement, and that Ajinomoto may not terminate the License Agreement pursuant to section 6.2 of the Agreement as a result of any such sale. (Compl. D.I. 1 ¶¶ a, b.)

Ajinomoto first heard about NutraSweet's potential sale of aspartame to the European Customer upon receiving a copy of the Complaint in this action. (Tomioka Decl. ¶ 20.) Ajinomoto has never made any express or implied threats to terminate the License Agreement as a result of such sales nor otherwise demonstrated an intent to do so. (*Id.*) Indeed, in contrast to the prior course of conduct outlined above, there have been no communications concerning the proposed sale to the European Customer of aspartame produced in Korea using the Daesang Process; no dispute crystallized, and, had there been one, there has been no opportunity to seek consensual resolution. (*Id.*)

NutraSweet previously raised with Ajinomoto sales of Korean-manufactured aspartame, but not in the context of the License Agreement or the Letter Agreement or in relation to sales to the European Customer, and no dispute emerged from such discussions. Specifically, in 2004, Ajinomoto asked NutraSweet whether

NutraSweet might be able to supply aspartame to Ajinomoto to help Ajinomoto overcome a temporary capacity shortage. (Tomioka Decl. ¶ 21.) NutraSweet sought to tie agreement on the supply arrangement to two unrelated intellectual property issues. (*Id.*) First, NutraSweet requested that Ajinomoto agree not to assert claims under its European patents with respect to import of Korean-manufactured aspartame by NutraSweet into Europe. Second, NutraSweet also wanted to resolve unrelated issues pertaining to certain neotame patents. (*Id.*) Ajinomoto took the consistent position that it wanted to deal with the issues separately and to deal with the supply agreement first. (*Id.*) NutraSweet agreed to consider that position at a November 17, 2004 Board of Directors meeting, following which NutraSweet's CEO advised Ajinomoto that NutraSweet was prepared to negotiate the supply agreement tied only to resolution of the neotame patent issues, not the European aspartame patent issues. (Tomioka Decl. ¶¶ 22-23; Email from Petray to Inamori of 11/19/04, attached to Tomioka Decl. as Ex. I.)

Although the parties met thereafter regarding the proposed supply agreement, Ajinomoto resolved its supply needs by other means, and the negotiations soon ended. (Tomioka Decl. ¶ 23.) NutraSweet made no further contact with Ajinomoto concerning any issue pertaining to imports of Korean aspartame between the November 19 email and NutraSweet's filing of this Complaint six months later. (Tomioka Decl. ¶ 24.)

To date, Ajinomoto has never asserted that NutraSweet's sale of aspartame produced in Korea using the Daesang Process constitutes a breach of the License Agreement or the Letter Agreement. (Tomioka Decl. ¶ 20.) Neither has

Ajinomoto threatened NutraSweet with termination of the License Agreement for any such sale nor threatened to file a patent infringement suit. (*Id.*)

NutraSweet's Complaint refers to Ajinomoto's previous patent-related disputes with Daesang (before the sale of its aspartame assets to NutraSweet), specifically to a case in The Hague, The Netherlands. (Compl. D.I. 1 ¶ 23.) In January 2001, Ajinomoto filed suit against Daesang in the District Court of The Hague alleging that aspartame manufactured by Daesang and imported into Europe infringed Ajinomoto's European patent, EP 0 091 787. (*Id.*) On August 13, 2003, the court dismissed Ajinomoto's infringement claims. (Tomioka Decl. ¶ 16.) This litigation between Ajinomoto and Daesang, however, *did not* involve the License Agreement or the Letter Agreement, or any of the Patents or Know-How licensed under those agreements. (*Id.*) Instead, this action related to one of Ajinomoto's European static crystallization patents, which is not licensed under the License Agreement because it falls within the Excluded Territory and which expired in 2003 in the E.U. (*Id.*)

In addition to the litigation in The Hague, Daesang and Ajinomoto were involved in two other legal actions relating to Ajinomoto's static crystallization patents. (Tomioka Decl. ¶ 17.) On February 27, 2001, Ajinomoto filed a suit against Daesang Japan, Ltd., in District Court in Tokyo, Japan, for infringement of Ajinomoto's Japanese static crystallization patents, JP Pat. No. 1790606 and 1790786. (*Id.*) On November 26, 2003, the district court ruled that Daesang's aspartame did not infringe these patents. (*Id.*) This litigation also did not involve the License Agreement or the Letter Agreement, or any of the Patents or Know-How licensed under those agreements because the patents fall within the Excluded Territory. These Japanese static crystallization patents expired

in 2002.  (*Id.*)  On September 27, 2001, Daesang Corporation filed an action against Ajinomoto in the High Court of Justice, Chancery Division, in London seeking revocation of Ajinomoto's European static crystallization patent, EP 0 091 787. (Tomioka Decl. ¶ 18.)  On May 7, 2003, the High Court issued an opinion dismissing Daesang's claims and ruling in favor of Ajinomoto on the validity of the patent.  (*Id.*)

Since 2003, Ajinomoto has not been involved in any other litigation with Daesang, nor has it been involved with or threatened litigation against NutraSweet concerning aspartame manufactured or sold using the Daesang Process since NutraSweet acquired the Daesang assets in 2003.  (Tomioka Decl. ¶ 19.)

## ARGUMENT

I.    **NUTRASWEET'S COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION UNDER THE DECLARATORY JUDGMENT ACT.**

Based on the sparse facts NutraSweet alleges in the Complaint, as well as the totality of circumstances surrounding the history of the parties' relationship under the License Agreement, NutraSweet has failed to establish the existence of a justiciable "actual controversy" between the parties as required under 28 U.S.C. § 2201(a) of the Declaratory Judgment Act and therefore this Court lacks subject matter jurisdiction to adjudicate these claims.  In essence, NutraSweet seeks an advisory opinion from this Court that the Daesang Process does not infringe the Patents or Know-How covered by the License Agreement.  That is not a permissible use of the Act and the Complaint therefore should be dismissed.

A.    **NutraSweet Cannot Establish An "Actual Controversy" As Required By 28 U.S.C. § 2201.**

The Declaratory Judgment Act requires "an actual controversy between the parties before a federal court may exercise jurisdiction over an action for declaratory relief." *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1331 (Fed. Cir. 2005) (quoting *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996)). Generally, the existence of an actual controversy within the meaning of the statute depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also Medimmune, Inc. v. Centocor, Inc.*, No. 04-1499, 2005 U.S. App. LEXIS 9965 at *6 (Fed. Cir. June 1, 2005) (quoting same) (affirming dismissal for lack of an actual controversy an action seeking declaratory judgment that plaintiff's product was not a "licensed product" under licensing agreement because it did not infringe upon the patents at issue) (previous procedural history at No. 02-1135, mem. op. (D. Md. filed June 17, 2004) and 271 F. Supp. 2d 762 (D. Md. 2003)) (unpublished opinions attached hereto as Ex. A). Thus, a court "must evaluate the totality of the circumstances in light of precedent to discern the presence or absence of an actual, and thus justiciable, controversy." *Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1380 (Fed. Cir. 2004).

NutraSweet, as the party seeking to invoke the court's jurisdiction, bears the burden of proving by a preponderance of the evidence that "jurisdiction over its declaratory judgment action existed at, and has continued since, the time the complaint was filed." *Int'l Med. Prosthetics Research Assocs., Inc. v. Gore Enter. Holdings, Inc.*,

787 F.2d 572, 575 (Fed. Cir. 1986). When considering a motion to dismiss under Rule 12(b)(1) for lack of jurisdiction, the court need not accept the allegations in the complaint as true, but may look behind the complaint and view the evidence to determine whether a controversy exists. *See Indium Corp. of America v. Semi-Alloys, Inc.,* 781 F.2d 879, 884 (Fed. Cir. 1985) (holding court may consider evidentiary matters outside the pleadings in granting motion to dismiss declaratory judgment action for lack of jurisdiction for failure to prove actual controversy); *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000) ("in a factual attack under Rule 12(b)(1), the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction"); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case").

For declaratory judgment actions necessarily involving patent infringement determinations such as this case, federal courts apply a two-step analysis to determine whether an "actual controversy" exists. *See BP Chems., Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed. Cir. 1993) (affirming dismissal of declaratory judgment action for lack of justiciable controversy); *see also Medimmune,* 2005 U.S. App. LEXIS 9965, at *6-7; *Gen-Probe*, 359 F.3d at 1380 (holding declaratory judgment action not properly before the court where licensing agreement is in place and licensee continues to pay royalties pursuant to the contract); *Teva Pharms.*, 395 F.3d at 1330; *TorPharm, Inc. v. Pfizer, Inc.*, No. 03-990-SLR, 2004 U.S. Dist. LEXIS 11930, at *34-*37 (D. Del. Jun. 28, 2004), *vacated as moot sub nom Apotex Inc. v. Pfizer Inc.*, No. 04-1463, U.S. App.

LEXIS 5930, at *1 (Fed. Cir. Apr. 11, 2005) (per curiam) (attached hereto as Ex. B). Plaintiff must demonstrate both: "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chems.*, 4 F.3d at 978; *see TorPharm, Inc.,* 2004 U.S. Dist. LEXIS 11930, at *19.

The "reasonable apprehension" prong of the test is an objective one, focusing on whether the defendant's conduct suffices to demonstrate an intent to enforce its intellectual property rights. *See Indium Corp.,* 781 F.2d at 883 ("The test is an objective one . . . [and] must exist at the time suit is filed. A purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement.") (citation omitted). "[This] requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053-54 (Fed. Cir. 1995). Further, "more is required than the existence of an adversely held patent," *BP Chems.*, 4 F.3d at 978, in order to "protect[] quiescent patent owners against unwarranted litigation," *Arrowhead Indus. Water, Inc. v. Ecolochem Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988). For example, there is no actual controversy "when a patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity." *Cygnus Therapeutic Sys. v. ALZA Corp.*, 92 F.3d 1153, 1160 (Fed. Cir. 1996), *overruled in part on other grounds by Nobelpharma AB v. Implant*

13

*Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998); *see also Wright Med. Tech., Inc. v. Osteonics Corp.*, 914 F. Supp. 1524, 1529 n.4 (W.D. Tenn. 1995) (mere assertion of infringement made in the context of licensing negotiations insufficient to create reasonable apprehension).

> 1.    NutraSweet Has Not Alleged and Cannot Demonstrate an Express Threat of Infringement, Termination, or Suit.

To assess the defendant's conduct, courts look initially for an explicit threat of suit. *See, e.g., Gen-Probe*, 359 F.3d at 1380; *Cygnus Therapeutic Sys.*, 92 F.3d at 1160 (affirming dismissal of declaratory judgment action for lack of actual controversy in the absence of an express threat to sue for infringement); *BP Chems.*, 4 F.3d at 979-980 (finding that comments about the strength of the patents at issue made to plaintiffs' customers did not constitute threats or create a reasonable apprehension of suit); *Wright Med. Tech.*, 914 F. Supp. at 1529 n.4 (distinguishing between a mere assertion of infringement in the course of licensing negotiations and "a full-blown accusation of patent infringement in the nature of a threat"). Indeed, the Federal Circuit has found no apprehension of suit where the patentee has made no contact with the declaratory judgment plaintiff. *See, e.g., West Interactive Corp. v. First Data Res. Inc.,* 972 F.2d 1295 (Fed. Cir. 1992) (finding no reasonable apprehension of suit where patentee made no contact with declaratory judgment plaintiff and sole source of plaintiff's apprehension was patent licensee's alleged statement to an unrelated party that plaintiff was infringing the patents at issue); *TorPharm Inc.*, 2004 U.S. Dist. LEXIS 11930, at *39.

Here, Ajinomoto has had no communication with NutraSweet concerning the planned sale of aspartame to the European Customer, much less expressly or impliedly threatened to terminate the License Agreement for breach or threatened to sue

for infringement.    (Tomioka Decl. ¶ 20.)    NutraSweet has not identified any facts supporting such a threat in its Complaint, nor could it given that Ajinomoto did not learn of the intended sale currently at issue until it received a copy of the Complaint filed in this matter.    (*Id.*)  Tellingly, NutraSweet made no effort to communicate with Ajinomoto regarding the proposed sale to the European Customer prior to filing this action.    (*Id.*)  Rather, the same day NutraSweet accepted the purchase order from the European Customer, it filed suit against Ajinomoto.  (Compl. D.I. 1 ¶ 26.)  In the complete absence of any communications between the parties on the subject, NutraSweet's claim of "an immediate and real threat that Ajinomoto will attempt to terminate the License Agreement" based on the proposed sale to the European Customer is unsupportable.  *See West Interactive Corp.*, 972 F.2d at 1297.

Moreover, even when NutraSweet raised the general possibility of sales of Korean-manufactured aspartame in Europe during supply agreement negotiations in 2004, Ajinomoto indicated that it was ready to discuss such issues with NutraSweet but wanted to address them separately from and after the supply agreement negotiations. Ajinomoto neither threatened termination of the License Agreement nor threatened litigation.  (Tomioka Decl. ¶ 22.)  After NutraSweet agreed to decouple the two issues in November 2002, it never again raised with Ajinomoto the issue of European imports from Korea over the next six months until it filed the Complaint in this action on May 20, 2005. (Tomioka Decl. ¶ 24.)

> 2.    Ajinomoto's Previous Litigation with Daesang Does Not Create an Objectively Reasonable Basis for Apprehension of Suit.

Absent an express threat, the inquiry consequently becomes whether NutraSweet's allegations relating to the "totality of circumstances" support an objectively

reasonable apprehension of termination or suit. *See Gen-Probe*, 359 F.3d at 1380; *BP Chems.*, 4 F.3d at 979. The answer to that question is plainly "no."

NutraSweet relies on the prior patent litigation between Ajinomoto and Daesang as its sole alleged basis to establish that it has a reasonable apprehension of termination of the License Agreement. (Compl. D.I. 1 ¶ 31.)[1] Numerous courts have rejected a general history of litigation by a defendant against third parties as the lone basis for establishing an actual controversy. *See, e.g., Teva Pharms.*, 395 F.3d at 1333-34; *West Interactive Corp.*, 972 F.2d at 1298; *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1212 (7th Cir. 1980); *TorPharm, Inc.,* 2004 U.S. Dist. LEXIS 11930, at *34-38; *DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*, 148 F. Supp. 2d 412, 415 (D. Del. 2001). This is particularly true where, as here, the record does not show that the defendant invariably pursues litigation against alleged infringers. *See West Interactive Corp.*, 972 F.2d at 1298 (concluding that defendant's litigation against three unrelated third parties for infringement of the patents at issue did not give plaintiff an objective reason to fear litigation against it).

Moreover, the specific litigation identified by NutraSweet is too remote to give rise to an objectively reasonable apprehension of harm or suit. *See Indium Corp.*, 781 F.2d at 883 ("The prior patent litigation initiated by Semi-Alloys in 1975, against two other parties unconnected with Indium, was too remote to make Indium's

---

[1] In paragraph 34 of the Complaint, NutraSweet alleges that Ajinomoto may also deliberately delay notice of termination of the License Agreement "until NutraSweet has made substantial sales of Aspartame into the Excluded Territory and is unable to effect a cure of the alleged breach or default pursuant to 6.2 of the License Agreement." (Compl. D.I. 1 ¶ 34.) This allegation, however, does not provide evidence of an actual controversy, as this is true of any potential contract dispute that has not materialized yet.

apprehension of further litigation in 1982 reasonable."). First, the action in The Hague specifically identified in the Complaint, as well as the two other suits between Daesang and Ajinomoto, were commenced in 2001, well before NutraSweet acquired the Daesang aspartame assets. (Tomioka Decl. ¶¶ 16-18.) Second, all of the litigation between Daesang and Ajinomoto terminated by 2003 and there has been no other litigation between the parties since then. (Tomioka Decl. ¶ 19.) Third, none of the litigation between Daesang and Ajinomoto involved either the License Agreement or the Letter Agreement or any of the Patents or Know-How licensed under those agreements. (Tomioka Decl. ¶¶ 16-18.) All three actions related to Ajinomoto's static crystallization patents issued in either Europe or Japan, which are not licensed under the License Agreement and which expired in 2002 in Japan and 2003 in the E.U. (*Id.*) Such litigation is too remote in time and subject matter to give rise to an objectively reasonable apprehension of termination of the License Agreement or threat of infringement suit. *See TorPharm Inc.*, 2004 U.S. Dist. LEXIS 11930, at *35-37 (finding no reasonable apprehension of suit notwithstanding: (1) the existence of litigation between defendant and another generic manufacturer for infringement of the same patent; (2) defendant's pending patent infringement suit against plaintiff in relation to another unrelated drug; and (3) defendant's general history of patent litigation against generics in relation to eight other pharmaceutical products); *Wright Med. Tech.*, 914 F. Supp. at 1531-32 (finding the history of patent litigation between defendant and plaintiff's predecessor corporation could not have contributed to a reasonable apprehension of suit by plaintiff and noting that the only suit ever filed between plaintiff and defendant was the declaratory judgment action at issue brought by plaintiff). And in the more than two years since NutraSweet

17

acquired the Daesang assets, there has been no litigation or threat of litigation between Ajinomoto and NutraSweet concerning them, notwithstanding the fact that NutraSweet informed Ajinomoto over six months ago of its plans to sell Korean-manufactured aspartame in Europe.  (Tomioka Decl. ¶¶ 19-21.)

Courts confronted with far more compelling allegations of a purported "reasonable apprehension" arising from prior litigation have rejected such claims.  In *Teva Pharmaceuticals*, for example, the Federal Circuit concluded that a generic manufacturer's subjective belief that it would be sued because the patentee had sued the first generic manufacturer on the *same patent* did not amount to a threat indicating the imminence of an infringement suit.  *Teva Pharms.*, 395 F.3d at 1333-34.  Moreover, the court found no reasonable apprehension of suit in that case notwithstanding such further allegations as that defendant had refused to grant plaintiff a covenant not to sue and had a history of aggressively asserting its patents against alleged infringers of other patents.  *Id.*

Similarly, in *DuPont Dow*, this Court found that the plaintiff had *not* demonstrated a reasonable apprehension of suit despite the fact that defendant had sent numerous letters to plaintiff warning of the possible infringement of its patent and that defendant had sued plaintiff for infringement of another patent after an exchange of similar correspondence.  In dismissing the case for lack of an actual controversy, this Court relied on the absence of (1) an express threat to sue; (2) a pattern of suing on the specific patent at issue in the declaratory judgment action; or (3) conduct that interfered with plaintiff's customer relations.  *DuPont Dow*, 148 F. Supp. 2d at 415.

Generally, in cases where courts have found prior litigation sufficiently threatening, either (1) the defendant referenced that litigation in some communication to

plaintiff, *see, e.g., Arrowhead*, 846 F.2d at 733, or (2) there was ongoing litigation between the parties over a series of closely-related patents involving the same technology, *see, e.g., Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 954 (Fed. Cir. 1987). *See Apotex, Inc. v. Pfizer Inc.*, 04 Civ. 2539, 2004 U.S. Dist. LEXIS 26232, at *19 (S.D.N.Y. Dec. 30, 2004) (attached hereto as Ex. C).  Here, NutraSweet alleges no such communication referencing the prior Daesang actions.  In addition, none of the three litigations with Daesang are ongoing and none involved the patents at issue in the current declaratory judgment action.  (Tomioka Decl. ¶¶ 16-18.) As in *DuPont Dow* and *Teva Pharmaceuticals*, the record in this case discloses no allegation or fact that could give rise to a reasonable apprehension by NutraSweet of termination or suit.

        3.      The Totality of Circumstances, Including the Parties' History of Amicable Negotiations Under the License Agreement, Negates Any Objectively Reasonable Apprehension of Termination or Suit.

      In fact, the parties here have a long history of amicable dispute resolution and negotiation over interpretation or possible breaches of the License Agreement, leading to numerous amendments or side agreements to accommodate certain NutraSweet sales that would otherwise be prohibited by the License Agreement, without Ajinomoto's resort to or threat of termination or court intervention.  (*See supra* pp. 7-9, 11-12; Tomioka Decl. ¶¶ 7-14.)  Indeed, over a 35-year history of relations between Ajinomoto and NutraSweet and its predecessors, Ajinomoto has never initiated litigation against NutraSweet concerning aspartame.  (Tomioka Decl. ¶ 14.)

      This course of conduct belies a finding that NutraSweet had a reasonable apprehension of immediate termination of the License Agreement when contemplating

the proposed sale to the European Customer.  *See BP Chems.*, 4 F.3d at 980 (taking into account fact that defendants "repeatedly expressed their desire to resolve amicably any problems that might arise" in discussions with plaintiffs as well as potential licensees to conclude that plaintiff lacked a reasonable apprehension of suit ); *Phillips Plastics*, 57 F.3d at 1053-54 (affirming dismissal of declaratory judgment action for lack of actual controversy where there were ongoing license negotiations between the parties and finding that a patentee's attempt to conduct license negotiations is a commercial activity, not a threat of suit, and therefore could not create a justiciable controversy).

NutraSweet has failed to allege a single act by Ajinomoto that could create a reasonable fear that Ajinomoto will terminate the License Agreement or will sue for infringement for NutraSweet's sale of aspartame manufactured using the Daesang Process to the European Customer.  Quite to the contrary, there is a demonstrated history of a willingness by Ajinomoto to negotiate in good faith and to reach amicable, *commercial* solutions to issues that arise under the License Agreement without resort to litigation.  When viewed in their totality, the "objective circumstances" in this case do not support a reasonable apprehension of termination or suit and therefore NutraSweet's claims for declaratory relief must be dismissed for lack of subject matter jurisdiction.

II.     **THIS COURT SHOULD, IN ANY EVENT, EXERCISE ITS DISCRETION TO DECLINE TO CONSIDER NUTRASWEET'S PREMATURE CLAIM FOR A DECLARATION OF RIGHTS UNDER THE LICENSE AGREEMENT.**

NutraSweet has not established (and cannot establish) a reasonable apprehension of suit or termination of the License Agreement by Ajinomoto.  Even if NutraSweet were able to satisfy the actual controversy prerequisites, however, it is well established that "district courts possess discretion in determining whether and when to

20

entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional requirements." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) (referencing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942)); *see also Teva Pharms.*, 395 F.3d at 1331 ("Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has substantial discretion to decline that jurisdiction.") (citations omitted). Indeed, the statute itself states that a court *may* issue a declaratory judgment. *See* 28 U.S.C. § 2201(a). "'There is nothing automatic or obligatory about the assumption of "jurisdiction" by a federal court' to hear a declaratory judgment action." *Wilton*, 515 U.S. at 288 (quoting E. Borchard, *Declaratory Judgments* 313 (2d ed. 1941)); *see also EMC Corp.*, 89 F.3d at 815 (declaratory action brought to gain advantage in licensing negotiations properly dismissed pursuant to court's discretion to decline to exercise jurisdiction). A court may exercise its discretion to refuse jurisdiction and dismiss a declaratory judgment action if it acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration and is based on "a reasoned judgment whether the investment of time and resources will be worthwhile." *EMC Corp.*, 89 F.3d at 813-814 (quoting *Servco Servs. Co. v. Kelly Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995)).

The instant case does not further the objectives of the Declaratory Judgment Act and thus this Court should decline to exercise jurisdiction. NutraSweet's premature declaratory judgment action is nothing more than procedural fencing to gain advantage in negotiations on this issue between the parties. The long history of relations between Ajinomoto and NutraSweet reflects a good faith commitment to reaching amicable business solutions to issues that arise under the License Agreement among the

21

parties. Thus, the need for judicial relief is "not as compelling here as in cases in which there is no real prospect of a non-judicial resolution of the dispute." *EMC Corp.*, 89 F.3d at 814 (citations omitted).

        In stark contrast to the parties' entire prior course of conduct under the License Agreement, NutraSweet has now raced to the courthouse without engaging in *any* communication between the parties on the specific sale to the European Customer. (Tomioka Decl. ¶ 20.) Inexplicably, NutraSweet filed this action despite Ajinomoto's stated willingness to discuss the issues relating to the sale of Korean-manufactured materials in Europe raised by NutraSweet during the 2004 supply agreement negotiations. (Tomioka Decl. ¶ 21.) After NutraSweet agreed to negotiate the supply agreement independently of the Europe/Korea intellectual property issues, it simply dropped the latter issues and then abruptly filed suit six months later. (Tomioka Decl. ¶ 24.) Whether NutraSweet's purpose in doing so is to try to gain a tactical advantage in negotiations or to pretermit negotiations altogether, such conduct is "inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources" and should not be rewarded. *Davox Corp. v. Digital Sys. Int'l, Inc.*, 846 F. Supp. 144, 148 (D. Mass. 1993) (declining to exercise jurisdiction over a declaratory judgment action in which the plaintiff filed suit while still engaged in negotiations with the patentee) (citation omitted); *see also EMC Corp.*, 89 F.3d at 814. In such circumstances, even if the Court had subject matter jurisdiction under the Act, it should decline to exercise it.

**CONCLUSION**

For all the foregoing reasons, the Court should dismiss NutraSweet's

Complaint for Declaratory Judgment for lack of jurisdiction or as a matter of discretion.

Co-Counsel:

CLEARY GOTTLIEB
  STEEN & HAMILTON, LLP
Matthew D. Slater, Esquire
Patricia M. McDermott, Esquire
Ilya Shapiro, Esquire
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-1801
(202) 974-1500
mslater@cgsh.com
pmcdermott@cgsh.com
ishapiro@cgsh.com

Dated:  June 24, 2005

68799v1/29191

POTTER ANDERSON & CORROON, LLP

By: _____
  Peter V. Walsh, Jr. (DSB ID No. 2437)
  1313 North Market Street
  Post Office Box 951
  Wilmington, Delaware  19899-0951
  (302) 984-6037
  pwalsh@potteranderson.com

*Attorneys for Defendant*
*Ajinomoto Co., Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, Peter J. Walsh, Jr., hereby certify that on June 24, 2005, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AJINOMOTO CO., INC.'S MOTION TO DISMISS with the Clerk of the Court using CM/ECF, which is available for public viewing and downloading, and which will send notification of such filing to the following counsel of record:

> James L. Holzman, Esquire (DSB ID No. 663)
> Gary F. Traynor (DSB ID No. 2131)
> J. Clayton Athey (DSB ID No. 4378)
> PRICKETT, JONES & ELLIOTT, P.A.
> 1310 King Street
> Wilmington, Delaware 19801
> Email: jlholzman@prickett.com
> Email: gftraynor@prickett.com
> Email: jcathey@prickett.com

> Peter J. Walsh, Jr. (DSB ID No. 2437)
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Post Office Box 951
> Wilmington, Delaware 19899-0951
> Tel: (302) 984-6000
> E-mail: pwalsh@potteranderson.com

687996v1/29191