IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NUTRASWEET COMPANY,<br><br>                Plaintiff,<br><br>        v.<br><br>AJINOMOTO CO., INC.,<br><br>                Defendant. | Case No. 05-318 (SLR) |

### DECLARATION OF YASUSHI TOMIOKA

1.      My name is Yasushi Tomioka. I am currently the Manager of the Ingredient Business Group, Sweeteners Department, at Ajinomoto Co., Inc. ("Ajinomoto"), in Tokyo, Japan. I joined Ajinomoto in 1986 and have been engaged in the sales and marketing of various Ajinomoto products in domestic and international markets throughout my tenure. I assumed my present position on July 1, 2000, in which I have responsibility for the sales, marketing, and administration of the industrial aspartame business. In my capacity as Manager of the Ingredient Business Group, Sweeteners Department, I am familiar with the Release and License Agreement dated May 25, 2000 ("License Agreement"), including the various communications between Ajinomoto and the NutraSweet Company ("NutraSweet") concerning the License Agreement, the subsequent amendments and side agreements thereto, the intellectual property covered by the License Agreement and its amendments, and patent litigation between Ajinomoto and Daesang Corporation and its affiliates relating to aspartame.

2.      The facts stated herein are based on my personal knowledge, communications with other Ajinomoto employees, and on my review of Ajinomoto business documents that have been made available to me for purposes of this declaration. Although

Japanese is my native language, I am comfortable using English for these purposes and understand the contents of this declaration.

3. Ajinomoto is a Japanese corporation having its principal place of business in Tokyo, Japan. Ajinomoto manufactures aspartame, a type of artificial sweetener, among other products. Ajinomoto holds numerous patents and certain proprietary know-how pertaining to the production of aspartame. Ajinomoto has been involved in various aspartame licensing agreements, supply agreements, and joint ventures with NutraSweet or its predecessor companies since 1970.

4. On May 25, 2000, Ajinomoto and NutraSweet entered into the License Agreement that, in relevant part, granted to NutraSweet a "perpetual, irrevocable, royalty-free, non-exclusive license and right" to use Ajinomoto's "Patents and Know-How" to manufacture and sell aspartame. (License Agreement § 2.1.) The "license and right" granted to NutraSweet under the License Agreement extends worldwide except for an "Excluded Territory" consisting of those countries identified in Exhibit B to the License Agreement. (License Agreement §§ 1(5), 2.3.) The Excluded Territory consists mostly of European countries, as well as Japan, Israel, and certain others. (License Agreement Ex. B.) A copy of the License Agreement is attached hereto at Exhibit A.

5. The intellectual property rights covered by the License Agreement include over 150 United States and Canadian patents and patent applications held by Ajinomoto, along with all of their foreign counterparts, and certain know-how regarding the manufacture of aspartame and L-Phenylalanine. (License Agreement § 1(6) and Exs. A and A-2.)

6. In early 2001, Ajinomoto became concerned that aspartame manufactured in the United States using its Patents and Know-How was being exported by NutraSweet to the

2

Excluded Territory, either directly or through a third party. A subsequent investigation revealed evidence of several apparent violations of the License Agreement, including the following: (a) two shipments of NutraSweet-manufactured aspartame totaling 45 metric tons shipped in June and September 2001 to MB Sveda in Gothenberg, Sweden, and a third shipment of 6.47 metric tons in July 2001 to Ashdod, Israel; (b) identification of NutraSweet's U.S.-manufactured aspartame at another customer location in Europe; and (c) various reports of communications in which NutraSweet apparently encouraged customers in the Excluded Territory to purchase NutraSweet's U.S.-manufactured aspartame from Vopak Chemical Distribution Europe B.V.

       7.     Ajinomoto's response to these apparent violations was to request a meeting with NutraSweet to discuss Ajinomoto's concerns. The parties thereafter exchanged information, and in a series of meetings over a six-month period engaged in negotiations that culminated in an amicable resolution of the disputed issues. On May 1, 2002, Ajinomoto and NutraSweet entered into a Letter Agreement ("Letter Agreement") that supplemented and amended the License Agreement. A copy of the Letter Agreement is attached hereto at Exhibit B. In the Letter Agreement, Ajinomoto and NutraSweet agreed, in relevant part, that NutraSweet would not "(a) itself export or (b) knowingly indirectly export, participate in the export, or cause or induce others to export" the aspartame covered by the License Agreement to the Excluded Territory. (Letter Agreement ¶ 3.)

       8.     Even though Ajinomoto had obtained information that indicated NutraSweet might be violating the License Agreement by effecting sales of aspartame into the Excluded Territory, Ajinomoto neither terminated the License Agreement nor resorted to litigation. In fact, in correspondence exchanged during the course of these negotiations dated February 28, 2002, David T. Bowman, General Counsel for NutraSweet, noted "NutraSweet and

3

Ajinomoto have always been able to resolve their differences and maintain the good relationship that exists." (Letter from David T. Bowman to Dr. Tetsuo Kono dated February 28, 2002, at 2, attached hereto at Exhibit C.)

9. On several other occasions since May 2000, NutraSweet has sought exceptions to the License Agreement to permit its otherwise prohibited sale of aspartame into the Excluded Territory. For example, when Cadbury France requested encapsulated aspartame from NutraSweet, Ajinomoto on numerous occasions granted permission orally and by letter agreement for NutraSweet to supply Cadbury in Europe despite the prohibition under the License Agreement.

10. Thus, on July 26, 2001, John Steffen of NutraSweet wrote to Lisa Schulthess of Ajinomoto's Swiss affiliate's office to request that Ajinomoto allow NutraSweet to continue supplying Cadbury France with encapsulated aspartame. A copy of this letter is attached hereto at Exhibit D. On May 30, 2002, I executed a letter agreement on behalf of Ajinomoto with Craig Petray of NutraSweet permitting NutraSweet to make shipments of encapsulated aspartame to Cadbury France in the Excluded Territory in May 2002 and June 2002. A copy of the letter agreement dated May 29, 2002, is attached hereto at Exhibit E.

11. Between January 2001 and August 2002, NutraSweet shipped as much as 8,800 kilograms of encapsulated aspartame to Cadbury in Europe under these arrangements. *See* Letter from C. Petray of NutraSweet to Yasushi Tomioka of Ajinomoto dated June 19, 2002, attached hereto at Exhibit F.

12. In August 2002, Ajinomoto negotiated at NutraSweet's request a Memorandum Agreement formalizing the arrangements to allow otherwise prohibited sales of encapsulated aspartame to Cadbury, which had previously been handled on an ad hoc basis (the

4

"2002 Memorandum Agreement"). The 2002 Memorandum Agreement created an exception to the License Agreement permitting NutraSweet to export up to 12 metric tons of encapsulated aspartame annually to Cadbury in the Excluded Territory under certain terms. A copy of the 2002 Memorandum Agreement is attached hereto at Exhibit G.

13. In 2003, NutraSweet sought to sell more encapsulated aspartame to another customer located in the Excluded Territory. On December 1, 2003, Ajinomoto again accommodated by entering into a Memorandum Agreement with NutraSweet, this time extending the exception to permit NutraSweet's sale of encapsulated aspartame to any customer in European Union member countries (the "2003 Memorandum Agreement"). A copy of the 2003 Memorandum Agreement is attached hereto at Exhibit H. NutraSweet currently continues to sell encapsulated aspartame in Europe pursuant to the terms of the 2003 Memorandum Agreement.

14. In each of these prior instances, Ajinomoto did not invoke its right to terminate the License Agreement and has avoided litigation with NutraSweet. In fact, Ajinomoto has never initiated litigation against NutraSweet or its predecessor companies relating to the various aspartame licensing agreements, supply agreements, or joint ventures in the 35-year history of relations between these parties.

15. On information and belief, NutraSweet acquired the aspartame manufacturing assets of Daesang Corporation of Korea, including associated intellectual property rights, in or about April 2003.

16. On January 10, 2001, prior to the acquisition of the Daesang aspartame assets by NutraSweet, Ajinomoto filed suit against Daesang Corporation in the District Court of The Hague alleging that aspartame manufactured by Daesang and imported into Europe

5

infringed Ajinomoto's European patent, EP 0 091 787. This litigation did not involve either the License Agreement or the Letter Agreement between Ajinomoto and NutraSweet or any of the patents or know-how licensed under those agreements. Instead, it related to one of Ajinomoto's European static crystallization patents, which is not licensed under the License Agreement because it falls within the Excluded Territory and which expired in 2003 in the E.U. On August 13, 2003, the court ruled that Daesang's aspartame did not infringe Ajinomoto's static crystallization patent.

17. Daesang and Ajinomoto were involved in two other legal actions relating to Ajinomoto's static crystallization patents. On February 27, 2001, Ajinomoto filed a suit against Daesang Japan, Ltd., in District Court in Tokyo, Japan, for infringement of Ajinomoto's Japanese static crystallization patents, JP Pat. No. 1790606 and 1790786. On November 26, 2003, the district court ruled that Daesang's aspartame did not infringe these patents. These Japanese static crystallization patents expired in 2002. This litigation also did not involve either the License Agreement or the Letter Agreement between Ajinomoto and NutraSweet or any of the patents or know-how licensed under those agreements.

18. On September 27, 2001, Daesang Corporation filed an action against Ajinomoto in the High Court of Justice, Chancery Division, in London seeking revocation of Ajinomoto's European static crystallization patent, EP 0 091 787. On May 7, 2003, the High Court issued an opinion dismissing Daesang's claims and ruling in favor of Ajinomoto on the validity of the patent.

19. Since 2003, Ajinomoto has not been involved in any other litigation with Daesang. Ajinomoto also has not been involved with or threatened litigation against NutraSweet

6

concerning aspartame manufactured or sold using the Daesang process since NutraSweet acquired those assets in 2003.

20. Ajinomoto first became aware of NutraSweet's potential sale of Korean-manufactured aspartame to a customer for delivery into the Czech Republic (the "European Customer") upon receiving a copy of the Complaint in this lawsuit. Before NutraSweet filed this suit, Ajinomoto had no communications to or from NutraSweet about a proposed sale to the European Customer of aspartame produced in Korea using the Daesang manufacturing process. Ajinomoto has never asserted that the sale in Europe of aspartame produced in Korea using the Daesang manufacturing process constitutes a breach of the License Agreement or the Letter Agreement, nor has Ajinomoto threatened NutraSweet with termination under Section 6.2 of the License Agreement or legal action for such a sale into the Excluded Territory.

21. In 2004, Ajinomoto initiated discussions with NutraSweet about a proposed agreement for NutraSweet to supply aspartame to Ajinomoto to help Ajinomoto meet its customers' needs. In connection with those negotiations at an August 20, 2004 meeting between the parties, NutraSweet sought to tie two unrelated intellectual property issues to the supply agreement. First, NutraSweet requested that Ajinomoto agree not to assert claims under its European patents with respect to the import of Korean-manufactured aspartame into Europe by NutraSweet. Second, NutraSweet also wanted to resolve unrelated issues pertaining to certain neotame patents. Ajinomoto's representatives told NutraSweet that although they were ready to discuss intellectual property issues, they wanted to deal with the supply agreement and patent issues separately and to take up the supply agreement first. The parties agreed to meet again. The August 2004 meeting was the first time that any Korean-manufactured material patent issue was ever discussed between the parties and such discussion was at NutraSweet's initiation.

22. At the subsequent meeting between the parties on November 8, 2004, NutraSweet again sought to tie the supply agreement negotiations to obtaining from Ajinomoto a waiver of legal action under its European patents due to European imports of NutraSweet's Korean-manufactured aspartame based on NutraSweet's assertion that such imports did not infringe Ajinomoto's patents. NutraSweet's representatives informed Ajinomoto that they had made plans for sales of the Korean-manufactured aspartame in Europe but provided no further details. Ajinomoto's representatives responded by reiterating their desire to deal with the supply agreement and intellectual property issues separately. NutraSweet agreed to raise at its November 17, 2004, Board of Directors meeting whether to separate the supply agreement negotiations from the intellectual property issues and promised to revert to Ajinomoto shortly thereafter.

23. On November 19, 2004, NutraSweet informed Ajinomoto by email following its Board meeting that NutraSweet would not insist on tying the supply agreement negotiations to resolving issues relating to NutraSweet's shipment of Korean-manufactured aspartame into Europe, but would continue to link the supply negotiations with resolution of the neotame patents issues. *See* Email from Craig R. Petray to Satoshi Inamori dated November 19, 2004, attached hereto as Exhibit I. Although the parties met again to discuss the potential supply agreement, those discussions ended because Ajinomoto found another means to meet its supply requirements.

24. Ajinomoto heard nothing more from NutraSweet on the Korean-manufactured aspartame issues before May 24, 2005, more than six months later, when it received a copy of the Complaint in this action in which NutraSweet referred to its agreement for delivery of Korean-manufactured aspartame to the European Customer.

8

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5̶7̶day of June, 2005 in Tokyo, Japan.

_____
Yasushi Tomioka

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, Peter J. Walsh, Jr., hereby certify that on June 24, 2005, I electronically filed the foregoing DECLARATION OF YASHUSHI TOMIKO with the Clerk of the Court using CM/ECF, which is available for public viewing and downloading, and which will send notification of such filing to the following counsel of record:

James L. Holzman, Esquire (DSB ID No. 663)
Gary F. Traynor (DSB ID No. 2131)
J. Clayton Athey (DSB ID No. 4378)
PRICKETT, JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, Delaware 19801
Email: jlholzman@prickett.com
Email: gftraynor@prickett.com
Email: jcathey@prickett.com

/s/ Peter J. Walsh
Peter J. Walsh, Jr. (DSB ID No. 2437)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware 19899-0951
Tel: (302) 984-6000
E-mail: pwalsh@potteranderson.com

688016v1/29191