IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NUTRASWEET COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-318 (SLR) |
| | ) | |
| AJINOMOTO CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S ANSWERING BRIEF IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

CO-COUNSEL:

MCDERMOTT WILL & EMERY LLP
Steven P. Handler
David F. Wentzel
John P. Killacky
Jeremy A. Root
227 West Monroe Street
Chicago, IL 60606
(312) 372-2000
shandler@mwe.com
dwentzel@mwe.com
jkillacky@mwe.com
jroot@mwe.com

PRICKETT, JONES & ELLIOTT, P.A.
James L. Holzman (#663)
Gary F. Traynor ( (#2131)
J. Clayton Athey (#4378)
1310 King Street
Wilmington, Delaware 19801
(302) 888-6500
jlholzman@prickett.com
gftraynor@prickett.com
jcathey@prickett.com

*Attorneys for Plaintiff,*
*The NutraSweet Company*

Dated: July 11, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

I.     STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS ............. 1

II.     SUMMARY OF THE ARGUMENT .................................................. 2

III.     COUNTER-STATEMENT OF FACTS ............................................... 3

     A.     The License Agreement Arose Out Of Historical Disputes With Ajinomoto ............................................................................ 3

     B.     Ajinomoto Previously Threatened To Terminate The License Agreement ............................................................................ 4

     C.     Ajinomoto's Reaction To The Sale Of Daesang-Manufactured Aspartame In The Excluded Territory Was Similar To Its Historical Conduct ............................................................................ 7

     D.     NutraSweet Has Delivered Daesang-Manufactured Aspartame To The Excluded Territory ................................................................. 9

     E.     NutraSweet's Sale Of Encapsulated Aspartame To Cadbury Is Not Evidence Of Ajinomoto's Reasonableness ................................... 9

     F.     Ajinomoto And NutraSweet Are Currently Engaged In Litigation Around The World ................................................................. 10

IV.     ARGUMENT ........................................................................... 11

     A.     THIRD CIRCUIT PRECEDENT PROVIDES THE RELEVANT STANDARDS TO BE APPLIED IN DECIDING THIS MOTION ....... 12

     B.     THE RECORD ESTABLISHES AN ACTUAL CONTROVERSY UNDER THE DECLARATORY JUDGMENT ACT ............................ 14

         1.     The Declarations Establish The Parties' Adversity Of Interests ..................................................................... 15

         2.     Because The Factual Predicate For This Action Is Complete, A Declaratory Judgment Would Be Conclusive .................... 23

         3.     A Declaratory Judgment Would Directly Affect The Future Actions Of The Parties ................................................... 25

     C.     DISCRETIONARY DISMISSAL OF THIS ACTION WOULD BE IMPROPER ........................................................................ 26

V.     CONCLUSION ....................................................................... 29

## TABLE OF AUTHORITIES

Page

### CASES

*Armstrong World Indus. v. Adams,*
  961 F.2d 405 (3d Cir. 1992)..................................................................... 15, 23, 24, 25

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,*
  846 F.2d 731 (Fed. Cir. 1988)...................................................................11, 12, 16, 28

*B.P. Chems. Ltd. v. Union Carbide Corp.,*
  4 F.3d 975 (Fed. Cir. 1993)................................................................................ 16, 18

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)...................................................................................................... 19

*Christianson v. Colt Indus. Operating Corp.,*
  486 U.S. 800 (1988)...................................................................................................... 13

*Davox Corp. v. Digital Sys. Int'l, Inc.,*
  846 F. Supp. 144 (D. Mass. 1993) ................................................................... 27, 29

*Dewey & Almy Chem. Co. v. American Anode,*
  137 F.2d 68 (3d Cir. 1943)................................................................................. 11, 16

*DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.,*
  148 F. Supp. 2d 412 (D. Del. 2001)................................................................. 20, 21

*EMC Corp. v. Norand Corp.,*
  89 F.3d 807 (Fed. Cir. 1996)........................................................................26, 27, 28, 29

*Envirometrics Software, Inc. v. Georgia-Pacific Corp.,*
  No. 97-243-SLR, 1997 U.S. Dist. LEXIS 17659 (D. Del. Nov. 4, 1997) ................ 25

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.,*
  824 F.2d 953 (Fed. Cir. 1987)............................................................................... 22

*Gould Elecs., Inc. v. United States,*
  220 F.3d 169 (3d Cir. 2000)....................................................................................... 1

*Grace Holdings, L.P. v. Sunshine Mining and Refining Co.,*
  901 F. Supp. 853 (D. Del. 1995)...................................................................... 15, 25

*Indium Corp. v. Semi-Alloys, Inc.,*
  781 F.2d 879 (Fed. Cir. 1985)................................................................................ 20

*Int'l Harvester Co. v. Deere & Co.,*
  623 F.2d 1207 (7th Cir. 1980) ................................................................................. 20

# TABLE OF AUTHORITIES
(continued)

**Page**

*Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux,*
    24 F.3d 1368 (Fed. Cir. 1994) ........................................................................ 14

*Maryland Cas. Co. v. Pacific Coal & Oil Co.,*
    312 U.S. 270 (1941) .................................................................................. 14, 15

*Millipore Corp. v. University Patents, Inc.,*
    682 F. Supp. 227 (D. Del. 1987) ................................................................... 18

*Moore Corp. v. Wallace Computer Servs., Inc.,*
    898 F. Supp. 1089 (D. Del. 1995) ....................................................... 15, 23, 25

*State Auto Ins. Cos. v. Summy,*
    234 F.3d 131 (3d Cir. 2000) ......................................................................... 26

*Step-Saver Data Sys., Inc. v. Wyse Tech.,*
    912 F.2d 643 (3d Cir. 1990) ........................................................ 2, 14, 15, 24, 25

*Symbol Techs., Inc. v. Hand Held Prods., Inc.,*
    No. 03-102-SLR, 2003 WL 22750145 (D. Del. Nov. 14, 2003) ............................ 18

*Teva Pharms. USA, Inc. v. Pfizer Inc.,*
    395 F.3d 1324 (Fed. Cir. 2005) ............................................................... 20, 21

*TorPharm, Inc. v. Pfizer Inc.,* No. 03-990-SLR,
    2004 U.S. Dist. LEXIS 11930 (D. Del. June 28, 2004) .......................... 17, 18, 19, 20

*U.S. Valves, Inc. v. Dray,*
    212 F.3d 1368 (Fed. Cir. 2000) ..................................................................... 13

*United States Aircraft Ins. Group v. Dwiggins, L.L.C.,*
    No. 03-173-SLR, 2004 U.S. Dist. LEXIS 266 (D. Del. Jan. 5, 2004) ...................... 26

*West Interactive Corp. v. First Data Res. Inc.,*
    972 F.2d 1295 (Fed. Cir. 1992) ..................................................................... 20

*Wright Med. Tech., Inc. v. Osteonics Corp.,*
    914 F. Supp. 1524 (W.D. Tenn. 1995) ............................................................ 21

## STATUTES

35 U.S.C. § 271 ............................................................................................. 13

28 U.S.C. § 1295 ........................................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

**Page**

28 U.S.C. § 1338 ........................................................................................ 2, 12, 13

28 U.S.C. § 2201 ........................................................................................ 1, 11, 14

Fed. R. Civ. P. 12(b)(1) ............................................................................... 1

## I.    STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

The NutraSweet Company ("NutraSweet") seeks a declaration that the export of
Aspartame manufactured in Korea in accordance with a certain process (the "Daesang
Process") to certain specified countries (the "Excluded Territory") does not breach a
Release and License Agreement (the "License Agreement") between it and Ajinomoto
Co., Inc. ("Ajinomoto").  Ajinomoto has moved to dismiss pursuant to Fed. R. Civ. P.
12(b)(1), arguing that there is no "actual controversy" as required under the Declaratory
Judgment Act, 28 U.S.C. § 2201.

Ajinomoto has submitted in support of its motion the declaration of Yasushi
Tomioka ("Tomioka Decl. D.I. 8"), thereby presenting a factual attack to this Court's
jurisdiction.  *See Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).
This Court may therefore consider and weigh evidence outside the pleadings to determine
if it has jurisdiction.  *Id.* at 178.  NutraSweet submits the declarations of William DeFer,
Jeffrey Hoster, and David Wentzel which establish that Ajinomoto's submissions are
incomplete, inaccurate, and misleading.  For example, Ajinomoto omits several critical
facts related to the negotiations over the May 2002 Letter Agreement, facts which
establish that those negotiations were highly contentious, not amicable as Ajinomoto's
papers now indicate.

Ajinomoto also fails to advise the Court that Ajinomoto expressly refused
NutraSweet's request for assurances that Ajinomoto would not take any adverse action
under the License Agreement based upon NutraSweet's intended export of Aspartame
manufactured in accordance with the Daesang Process to the Excluded Territory.
Instead, Ajinomoto insisted that NutraSweet obtain an additional license from Ajinomoto
to do so.  To this day, Ajinomoto has refused to reveal its intentions with respect to the

issues presented in NutraSweet's Complaint, despite NutraSweet's counsel's offer to voluntarily dismiss this case if Ajinomoto stipulated that such conduct was not a breach of the License Agreement.

For these reasons and those that follow, Ajinomoto's motion should be denied.

## II.    SUMMARY OF THE ARGUMENT

(1)    Ajinomoto's presumption that this action is a patent case governed by Federal Circuit precedent is incorrect.  This contract action seeks only a determination whether NutraSweet's sale of Aspartame manufactured in Korea in accordance with the Daesang Process constitutes a breach or default in performance of the License Agreement.  Jurisdiction over this matter is not based upon 28 U.S.C. §1338.  Federal patent law does not create NutraSweet's cause of action, nor does NutraSweet's right to relief depend upon resolution of any question of federal patent law.  Accordingly, Third Circuit precedent provides the controlling standard for determining whether this action presents a justiciable case or controversy.[1]

(2)    Ajinomoto's motion should be denied because the facts alleged in the Complaint and established by the declarations demonstrate an actual controversy under the three criteria established by the Third Circuit in *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643 (3d Cir. 1990).  First, the dispute between Ajinomoto and NutraSweet presents an immediate and real controversy that warrants declaratory relief.  Second, the factual predicate for NutraSweet's claim is fully developed and not based upon hypothetical facts such that a judgment would be inconclusive.  Third, a declaration by the Court would be useful to the parties in that it would guide their behavior, including

---

[1] Even if the Court were to conclude that the Federal Circuit precedent were controlling, an actual controversy still would exist.  *See* fn. 4, *infra*.

NutraSweet's decision to continue exporting Aspartame manufactured in accordance with the Daesang Process into the Excluded Territory.

(3)    This Court should not exercise its discretion to dismiss this lawsuit. Ajinomoto's motion fails to establish any of the circumstances recognized by the Third Circuit for discretionary dismissal of a declaratory judgment action. Furthermore, Ajinomoto fails to explain how NutraSweet obtains any tactical advantage by filing this action that would be contrary to the purposes of the Declaratory Judgment Act.

## III.    COUNTER-STATEMENT OF FACTS

This case involves the interpretation of the License Agreement as applied to NutraSweet's export of Aspartame manufactured in Korea in accordance with the Daesang Process ("Daesang-Manufactured Aspartame") to the Excluded Territory. The following statement is taken from the Complaint and attached documents, and the declarations submitted by Ajinomoto and NutraSweet in support of their briefs.[2]

### A.    The License Agreement Arose Out Of Historical Disputes With Ajinomoto.

NutraSweet and Ajinomoto became parties to the License Agreement in May 2000. (Compl. D.I. 1, ¶¶ 15-16). One of the primary purposes of the License Agreement was to settle a long history of intellectual property disputes with Ajinomoto in order to facilitate Monsanto's sale of its U.S. based Aspartame manufacturing business ("NSC") to a private party. (DeFer Decl. ¶¶ 3-6). Beginning as early as 1987, Ajinomoto had routinely threatened Monsanto and NSC with infringement litigation arising out of patents related to the manufacture of Aspartame. (DeFer Decl. ¶ 5). In fact, after the

---

[2] Pursuant to Local Rule 7.1.3(c)(1)(E), this counter-statement of facts will minimize repetition of the facts set forth in Ajinomoto's opening brief.

announcement of Monsanto's intent to sell NSC in 1999, Ajinomoto made new threats of patent infringement litigation related to NSC's Aspartame manufacturing process. (DeFer Decl. ¶ 6).  Thus, the License Agreement was negotiated to release Monsanto's and NSC's successor, NutraSweet, from potential liabilities arising out of Ajinomoto's prior threats of patent infringement litigation against Monsanto and NSC.  (*Id.*; *see also* Compl. D.I. 1, Ex. 1).

The other purpose of the License Agreement was to permit NutraSweet to continue using certain licenses pursuant to which NSC had manufactured Aspartame at its Augusta, Georgia facility prior to May 2000.  (DeFer Decl. ¶ 4).  Since May 2000, NutraSweet has continued to manufacture Aspartame pursuant to certain of the licenses granted under the License Agreement.  (*Id.*)  If Ajinomoto were to terminate the License Agreement, NutraSweet would be unable to continue using its current Aspartame manufacturing processes and effectively would be out of business.  (*Id.*)  Further, when Ajinomoto has threatened to terminate the License Agreement in the past, such threats have caused NutraSweet serious problems in its relationships with customers and creditors.  (*Id.*)  Ajinomoto has demonstrated that it is well-aware of these facts through its past negotiations with NutraSweet.  (*Id.*)

**B.     Ajinomoto Previously Threatened To Terminate The License Agreement.**

Ajinomoto claims that it "has a history of fair and reasonable dealing with NutraSweet when faced with potential differences involving interpretation of or performance of the License Agreement." (Mem. D.I. 7 at 4).  As support for this general proposition, Ajinomoto maintains that the negotiations leading to the May 2002 Letter Agreement ("Letter Agreement," attached to Tomioka Decl. D.I. 8 as Ex. B), represent a

matter that "was resolved amicably without resort to termination of the License

Agreement and without a lawsuit." (Mem. D.I. 7 at 5). These claims are inaccurate.

      In late 2001, Ajinomoto vaguely articulated a concern about a possible violation

of the "export restrictions" of the License Agreement and demanded a meeting with

NutraSweet to discuss that concern. (Hoster Decl. ¶ 4 & Ex. B). Ajinomoto refused to

provide NutraSweet with any further information regarding its concern in advance of the

meeting. (Hoster Decl. ¶¶ 6-7 & Exs. C, D, E). Nonetheless, NutraSweet's counsel,

David Bowman and Jeffrey Hoster, attended a meeting with representatives of Ajinomoto

and its counsel on December 21, 2001. (Hoster Decl. ¶ 8). At that meeting, Ajinomoto

informed NutraSweet for the first time of the basis of its concern and demanded an

explanation from NutraSweet. (Hoster Decl. ¶¶ 8-9). Ajinomoto's counsel, Joshua

Rawson of Ajinomoto's current counsel's firm, threatened NutraSweet with patent

infringement litigation and stated that NutraSweet was in breach of the License

Agreement. (Hoster Decl. ¶ 9).

      Ajinomoto's threatening conduct continued into 2002, as it repeated the same

claims of patent infringement and breach of the License Agreement in a February 18,

2002 letter to NutraSweet's general counsel. (Hoster Decl. ¶¶ 11-12 & Ex. G). In

response, NutraSweet's general counsel wrote a letter outlining NutraSweet's position on

February 28, 2002. (Hoster Decl. ¶ 13 & Ex. H). Ajinomoto selectively highlights an

excerpt from this letter which notes the parties' ability to amicably resolve their

differences as evidence of Ajinomoto's reasonableness. (Mem. D.I. 7 at 4; Tomioka

Decl. D.I. 8, ¶ 8 & Ex. C). However, Ajinomoto neglects to advise this Court of

NutraSweet's serious concern expressed in that same letter that the dispute would

"escalate to a level where Ajinomoto formally provides a notice of breach under the Release and License Agreement." (Hoster Decl. ¶ 13 & Ex. H; Tomioka Decl. D.I. 8, Ex. C). Ajinomoto also fails to disclose that it was NutraSweet who requested Ajinomoto to propose a resolution to the dispute. (Hoster Decl. ¶ 13 & Ex. H). In fact, after hearing nothing from Ajinomoto for nearly a month after the February 28 letter, NutraSweet's general counsel wrote another letter to Ajinomoto specifically seeking a response. (Hoster Decl. ¶ 14 & Ex. I). Ajinomoto finally responded by issuing a formal notice of breach of the License Agreement. (Hoster Decl. ¶ 15 & Ex. J).

Only after issuing a formal notice of breach and invoking NutraSweet's cure obligations did Ajinomoto seriously engage in any efforts to resolve the matter. The negotiations which followed proceeded essentially on Ajinomoto's terms, even though NutraSweet maintained at all times that it was not in breach. (Hoster Decl. ¶¶ 16-18). Ajinomoto's terms of settlement went far beyond a cure of any alleged breach, which would have been limited to a cessation of the alleged breaching conduct and payment of damages. (*See* License Agreement § 6.2). Ajinomoto used the threat of termination against NutraSweet to extract substantial amendments to the License Agreement. (*See* Hoster Decl. ¶¶ 17-18; Defer Decl. ¶ 4; Tomioka Decl. D.I. 8, Ex. C). Further, NutraSweet was required to purchase a substantial quantity of Aspartame from Ajinomoto on terms that amounted to a penalty. (Hoster Decl. ¶ 17; Tomioka Decl. D.I. 8, Ex. C). Ajinomoto was able to achieve this result because of the leverage it held over NutraSweet by virtue of its threat to terminate the License Agreement. (*See* DeFer Decl. ¶ 4).

C.    **Ajinomoto's Reaction To The Sale Of Daesang-Manufactured Aspartame In The Excluded Territory Was Similar To Its Historical Conduct.**

Ajinomoto also mischaracterizes the facts regarding its reaction when it learned that NutraSweet intended to export Daesang-Manufactured Aspartame to the Excluded Territory.  As an initial matter, Ajinomoto was well-aware that Daesang-Manufactured Aspartame was being exported to portions of the Excluded Territory well before NutraSweet informed of its intent to do the same.  In fact, Ajinomoto had previously sued Daesang in the Netherlands and Japan for such exports.  (*See* Tomioka Decl. D.I. 8, ¶¶ 16-17).  NutraSweet seeks only to continue such exports, and the only thing that has changed in this case is the fact that NutraSweet, rather than Daesang Corporation, now owns the Daesang Process.

Additionally, Ajinomoto's characterization of the parties' attempt to negotiate NutraSweet's right to continue such exports is inaccurate.  During the summer of 2004, Ajinomoto approached NutraSweet about purchasing Aspartame from NutraSweet in order to cover a shortfall in production capacity that Ajinomoto was experiencing.  (DeFer Decl. ¶¶ 7-8; Tomioka Decl. D.I. 8, ¶ 21).  In August 2004, the parties had a meeting to discuss the contemplated purchase.  (DeFer Decl. ¶ 8; Tomioka Decl. D.I. 8, ¶ 21).  At that meeting, NutraSweet proposed that it would sell Aspartame to Ajinomoto if the parties could reach agreement on two issues.  (DeFer Decl. ¶ 8; Tomioka Decl. D.I. 8, ¶ 21).  First, NutraSweet wanted to enter into mutual licensing agreements with Ajinomoto in order to resolve pending litigation and other adversarial actions between the parties involving patents related to blends of artificial sweeteners, including neotame, Aspartame, and acesulfame K.  (DeFer Decl. ¶ 8; Tomioka Decl. D.I. 8, ¶ 21).  Second, NutraSweet informed Ajinomoto that it intended to export Aspartame manufactured in

Korea in accordance the Daesang Process to Europe, and NutraSweet sought Ajinomoto's assurance that Ajinomoto would not terminate the License Agreement or take any other adverse action under the License Agreement based upon the export of such Aspartame. (DeFer Decl. ¶ 8).  Ajinomoto refused to give NutraSweet that assurance.  To the contrary, Ajinomoto's attorney, Ms. Fumiko Takahashi, asserted that NutraSweet needed to obtain a license from Ajinomoto in order to export Daesang-Manufactured Aspartame to Europe.  (*Id.*)  Throughout the remainder of those negotiations, which terminated in November 2004, Ajinomoto maintained its position that NutraSweet needed a license to export Daesang-Manufactured Aspartame to Europe, and Ajinomoto insisted on negotiating this issue separately from the ongoing purchase negotiations.  (DeFer Decl. ¶ 9).

To this day, Ajinomoto has refused to provide any assurances to NutraSweet regarding the matters at issue in this lawsuit—specifically, whether Ajinomoto considers the export of Daesang-Manufactured Aspartame to the Excluded Territory to be a violation of the License Agreement.  Prior to Ajinomoto's filing of this motion, Ajinomoto's counsel indicated to NutraSweet's counsel that it was considering bringing the instant motion.  (Wentzel Decl. ¶ 2).  In response to that discussion, NutraSweet's counsel sent a letter offering to voluntarily dismiss this action if Ajinomoto acknowledged that the export of Daesang-Manufactured Aspartame to the Excluded Territory did not violate the License Agreement.  (Wentzel Decl. ¶ 3 & Ex. 1).  Ajinomoto never responded to NutraSweet's invitation.  (Wentzel Decl. ¶ 4).  Instead, Ajinomoto proceeded to file this motion.

**D.     NutraSweet Has Delivered Daesang-Manufactured Aspartame To The Excluded Territory.**

In May 2005, NutraSweet accepted a purchase order for Aspartame from a customer located in the Czech Republic, one of the countries listed in the Excluded Territory.  (DeFer Decl. ¶ 11; Compl. D.I. 1, ¶¶ 26-27).  NutraSweet has since delivered Daesang-Manufactured Aspartame to that customer to fill the purchase order.  (DeFer Decl. ¶ 11).  In addition, since this Complaint was filed, NutraSweet has delivered Daesang-Manufactured Aspartame to customers in a number of other countries located in the Excluded Territory, including Spain, Portugal, Hungary, Poland, Ukraine, Russia, and Belarus.  (*Id.*)

**E.     NutraSweet's Sale Of Encapsulated Aspartame To Cadbury Is Not Evidence Of Ajinomoto's Reasonableness.**

Ajinomoto also relies on alleged oral and written exceptions it claims to have made to the License Agreement as evidence of its good intentions.  (Mem. D.I. 7 at 5-6).  These exceptions involve Ajinomoto's agreement to permit NutraSweet to sell limited amounts of encapsulated Aspartame to a single customer in Europe ("Cadbury").  (Mem. D.I. 7 at 5-6; Tomioka Decl. D.I. 8, ¶¶ 9-14).  Encapsulated Aspartame is a special type of Aspartame, and NutraSweet is the sole manufacturer of encapsulated Aspartame in the world.  (DeFer Decl. ¶¶ 13-14).  In fact, NutraSweet had been supplying encapsulated Aspartame for Cadbury (and its predecessors) since the early 1990s.  (DeFer Decl. ¶ 15).  Although Cadbury is a customer of Ajinomoto for regular Aspartame, Ajinomoto could not supply Cadbury with encapsulated Aspartame.  (DeFer Decl. ¶¶ 14-15).  NutraSweet and Ajinomoto thus agreed to permit NutraSweet to continue supplying Cadbury since it was the only viable solution without disrupting Cadbury's operations.  (*Id.*)  Even so, such sales have constituted less than 0.2 % of NutraSweet's total sales volume for

Aspartame products. (DeFer Decl. ¶ 12). If Ajinomoto had not agreed to allow

NutraSweet to supply encapsulated Aspartame, Ajinomoto risked antagonizing one of its

own customers. (*See* DeFer Decl. ¶ 15). Thus, Ajinomoto's actions respecting

NutraSweet's limited sales to Cadbury prove nothing about Ajinomoto's reasonableness.

> **F.     Ajinomoto And NutraSweet Are Currently Engaged In Litigation
> Around The World.**

Although Ajinomoto's statement of facts discusses its litigation history with

Daesang, it is devoid of any reference to currently-pending litigation and other

adversarial matters between it and NutraSweet. In recent years, the parties' relationship

has become increasingly contentious and litigious.

Specifically, in June 2003, Ajinomoto initiated an interference between one of its

patent applications and a NutraSweet patent in the U.S. Patent and Trademark Office

("USPTO"). (DeFer Decl. ¶ 18). On July 30, 2004, the USPTO declared the

interference, captioned *Ajinomoto Co., Inc. v. The NutraSweet Company*, USPTO, Board

of Patent Appeals and Interferences, Patent Interference No. 105,246 (RES). (*Id.*)

Related to that action, NutraSweet requested the reexamination of two patents owned by

Ajinomoto. (DeFer Decl. ¶ 19). These proceedings are ongoing and involve blends of

artificial sweeteners, including neotame, Aspartame, and acesulfame K. (DeFer Decl.

¶¶ 18-19). Litigation has also been pending since 2002 in the Federal Court of Australia

(Victoria), also involving a patent directed to neotame and owned by Ajinomoto. (DeFer

Decl. ¶ 20). That case is captioned *NutraSweet Australia Pty. Ltd., v. Ajinomoto Co.,

Inc.*, Proceeding No. V174 of 2002. (*Id.*)

Ajinomoto also attempts to downplay its litigation with Daesang, pointing out that

it was related to certain static crystallization patents that have since expired and are not

covered by the License Agreement.  It is important to note, however, that those suits involved portions of the same Daesang Process at issue in this case.  Further, Ajinomoto initiated two of these lawsuits in the Netherlands and in Japan, both of which are in the Excluded Territory and into which Daesang Corporation was exporting Daesang-Manufactured Aspartame.  In this case, NutraSweet seeks only a declaration that its continued export of Daesang-Manufactured Aspartame does not violate the License Agreement.

## IV.     ARGUMENT

Ajinomoto suggests that it has been consistently accommodating in its relationship with NutraSweet, always seeking an amicable resolution when differences arise involving the License Agreement.  In fact, Ajinomoto brandishes the License Agreement as a "Damoclean threat with a sheathed sword," holding the specter of termination over NutraSweet's head when those differences are not settled on Ajinomoto's terms.  *See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988).   This type of scenario is what motivated the enactment of the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201.  *See id.*

In fact, in similar circumstances where a defendant was attempting to do with a patent what Ajinomoto is seeking to do here with the License Agreement, the Third Circuit found jurisdiction under the DJA:

> In thus using the patent as a legal as well as an economic weapon [defendant] has put [plaintiff] in the position where it must either (1) abandon the use of the process, (2) accept a license on terms which it deems disadvantageous, or (3) persist in piling up potential damages against the day when it may fit [defendant's] purposes to bring an infringement suit against it.

*Dewey & Almy Chem. Co. v. American Anode*, 137 F.2d 68, 71 (3d Cir. 1943).

Ajinomoto uses the License Agreement and all of the patents covered by it as a legal and economic weapon against NutraSweet. Ajinomoto's unyielding refusal to address the issue or reveal its intentions with regard to the Daesang Process has put NutraSweet in the position of either abandoning its plans to export Daesang-Manufactured Aspartame to the Excluded Territory, accepting a license on Ajinomoto's terms, or waiting until Ajinomoto deems it advantageous to sue for breach of the License Agreement and face potentially large damages. (*See, e.g.*, Compl. D.I. 1, ¶ 34). Even more daunting than the threat of suit for damages under the License Agreement by Ajinomoto is the possibility that Ajinomoto may purport to terminate the License Agreement, thereby threatening NutraSweet's ability to continue its business. (*See, e.g.*, Compl. D.I. 1, ¶¶ 17, 33; DeFer Decl. ¶ 4). Such extra-judicial conduct by Ajinomoto would be fundamentally at odds with the purposes of the DJA. *See, e.g., Arrowhead*, 846 F.2d at 735 (stating that the DJA was enacted to prevent "guerrilla-like" tactics where the "patent owner attempts extra-judicial patent enforcement" which "infect the competitive environment of the business community with uncertainty and insecurity").

### A.    THIRD CIRCUIT PRECEDENT PROVIDES THE RELEVANT STANDARDS TO BE APPLIED IN DECIDING THIS MOTION.

Ajinomoto summarily asserts that this action "necessarily involv[es] patent infringement determinations," and that therefore, the Federal Circuit's two-step analysis for determining the existence of an actual controversy applies. (Mem. D.I. 7 at 12). Because none of the prerequisites for Federal Circuit jurisdiction are satisfied in this case, Ajinomoto's reliance on Federal Circuit authority is misplaced.

The Federal Circuit has exclusive jurisdiction over all cases "arising under any Act of Congress relating to patents ...." 28 U.S.C. §§ 1295 & 1338(a). NutraSweet has

not invoked exclusive federal subject matter jurisdiction under 28 U.S.C. § 1338.

Nonetheless, a case may satisfy the "arising under" requirement if the federal patent laws

either: (1) create the cause of action; or (2) are a necessary element of plaintiff's claim.

*See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988). Here,

federal patent law does not create NutraSweet's claim—this case involves a breach of

contract under Delaware state law. (*See* License Agreement, § 9.6(a)).

      Nor is federal patent law a necessary element of NutraSweet's claim. This

element is typically satisfied if the plaintiff's right to relief requires the resolution "of a

substantial question of federal patent law." *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368,

1372 (Fed. Cir. 2000). However, none of NutraSweet's conduct at issue, i.e. the export

of Daesang-Manufactured Aspartame into the Excluded Territory, has or will occur in the

United States. The Aspartame at issue is manufactured in Korea and exported to the

Excluded Territory, which does not include the United States. Thus, there can be no

infringement under federal patent law arising out of that conduct. *See* 35 U.S.C. § 271

(defining patent infringement as including activity occurring only "within the United

States" or importation "into the United States").[3]

      The only issue here is NutraSweet's right to continue the export of Daesang-

Manufactured Aspartame from Korea to the Excluded Territory. (*See* License Agreement

§ 2.3). At best for Ajinomoto, this case may require the resolution of questions of

Korean patent law to determine if the Daesang Process infringes the Korean counterparts

---

[3] Indeed, the only way a question of federal patent law could arise under the License Agreement is if
Ajinomoto terminates the License Agreement and then sues NutraSweet for breach of the U.S. Patents
licensed under the License Agreement because such patents may be used at the Augusta, Georgia facility.
Of course, such action would have no relevance to the export of Daesang-Manufactured Aspartame from
Korea to the Excluded Territory.

to the patents listed on the License Agreement. In fact, NutraSweet has alleged that the

only patents covered by the License Agreement implicated by the export of Daesang-

Manufactured Aspartame into the Excluded Territory are the Korean counterparts to the

patents listed on the License Agreement (Compl. D.I. 1, ¶ 21), and Ajinomoto has not

contested this allegation. But neither Section 1295 nor Section 1338 extend the Federal

Circuit's exclusive jurisdiction to matters of foreign patent infringement. *See, e.g., Mars,*

*Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, (Fed. Cir. 1994) (holding that

district court lacked jurisdiction over Japanese patent infringement claim under Section

1338). Thus, Third Circuit authority is controlling.[4]

### B.    THE RECORD ESTABLISHES AN ACTUAL CONTROVERSY UNDER THE DECLARATORY JUDGMENT ACT.

The DJA authorizes federal courts to make prospective declarations regarding

"the rights and other legal relations of any interested party seeking such declaration." 28

U.S.C. § 2201. Prior to enactment of the DJA, "you take a step in the dark and then turn

on the light to see if you stepped into a hole. Under the [DJA], you turn on the light and

then take the step." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649-50 (3d

Cir. 1990) ("*Step Saver*") (quoting 69 Cong. Rec. 2108 (1928)).

The sole jurisdictional requirement under the DJA is that the case present "an

actual controversy"—that is, one "of sufficient immediacy and reality to warrant the

issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312

U.S. 270, 273 (1941); *Step-Saver*, 912 F.2d at 647. Although there is no "precise test for

---

[4] Even if the Court were to conclude that the Federal Circuit's two-step analysis applies in this case, an actual controversy would still exist. With respect to the first requirement of a reasonable apprehension of a lawsuit, the same facts establishing an actual controversy under the Third Circuit's *Step-Saver* analysis also satisfy this prong. As to the second prong, i.e. that NutraSweet is engaged in present activity which could constitute infringement or has taken concrete steps with the intent to conduct such activity, Ajinomoto concedes this element is satisfied by not even raising it in its motion.

determining in every case whether there is such a controversy," *Maryland Cas. Co.*, 312 U.S. at 273, the Third Circuit has generally considered three criteria to be relevant: (1) adversity of interests of the parties; (2) conclusiveness of the judicial determination; and (3) the practical utility of that determination. *Step-Saver*, 912 F.2d at 647; *Grace Holdings, L.P. v. Sunshine Mining and Refining Co.*, 901 F. Supp. 853, 858-859 (D. Del. 1995). In this case, each of these factors is satisfied.

### 1.     The Declarations Establish The Parties' Adversity Of Interests.

To satisfy *Step-Saver*'s "adversity of interest" element, a plaintiff must demonstrate either: (1) presently adverse legal interests between the parties; or (2) the threat of immediate and real future harm. *Moore Corp. v. Wallace Computer Servs., Inc.*, 898 F. Supp. 1089, 1095 (D. Del. 1995). To establish the threat of immediate and real future harm, the plaintiff must demonstrate "that the probability of that future event occurring is real and substantial [and] of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Armstrong World Indus. v. Adams*, 961 F.2d 405, 411-12 (3d Cir. 1992).

Although addressed in the context of the Federal Circuit's "reasonable apprehension" analysis, Ajinomoto advances three arguments why this action does not warrant the issuance of a declaratory judgment. First, Ajinomoto asserts out that it has not made any express threat of litigation or termination of the License Agreement based upon NutraSweet's present activity. Second, Ajinomoto argues that its litigation with Daesang is irrelevant to this case. Finally, Ajinomoto contends that the "totality of the circumstances" fails to establish a reasonable apprehension of suit. Ajinomoto's positions are both legally and factually flawed. The Complaint and the declarations

submitted in support of Ajinomoto's motion and this answering brief establish the
adversity of interests between the parties.

        a.      Ajinomoto's Conduct Establishes A Real And Immediate
                 Threat Of Future Harm To NutraSweet.

      Ajinomoto asserts that jurisdiction over NutraSweet's claim is "unsupportable,"
because there were no communications between the parties regarding this issue and
Ajinomoto never expressly threatened NutraSweet with a suit for breach or infringement.
(Mem. D.I. 7 at 14-15).  As a matter of law, an explicit threat of suit is not required, even
under the Federal Circuit precedent espoused by Ajinomoto.  *B.P. Chems. Ltd. v. Union
Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993); *Arrowhead*, 846 F.2d at 736 ("In light
of the subtleties in lawyer language, … courts have not required an express infringement
charge.").  Indeed, a declaratory judgment action may be proper even when a defendant
first learns of plaintiff's conduct upon receipt of the complaint.  *Arrowhead*, 846 F.2d at
738; *Dewey & Almy Chem. Co.*, 137 F.2d at 71.  Three instances of Ajinomoto's conduct
establish a real and substantial threat of future harm to NutraSweet:  (1) Ajinomoto's
threatening conduct during the negotiations of the May 2002 Letter Agreement;
(2) Ajinomoto's August 2004 demand that NutraSweet obtain a license to export
Daesang-Manufactured Aspartame to the Excluded Territory; and (3) Ajinomoto's recent
and continued refusal to reveal its intentions regarding the export of Daesang-
Manufactured Aspartame to the Excluded Territory.

        (1)      The May 2002 Letter Agreement Establishes
                 Ajinomoto's History Of Oppressive Conduct.

      Ajinomoto's disingenuous assertion that it "has a history of fair and reasonable
dealing with NutraSweet" regarding the License Agreement (Mem. D.I. 7 at 4), is belied
by Ajinomoto's conduct which led to the May 2002 Letter Agreement.  Ajinomoto

- 16 -

asserts that it "requested a meeting to discuss [its] concerns" when it became aware of possible violations of the License Agreement. (Mem. D.I. 7 at 4-5). At that meeting, however, Ajinomoto's attorney threatened NutraSweet with a patent infringement lawsuit and claimed that NutraSweet had breached the License Agreement. (Hoster Decl. ¶¶ 8-9). Moreover, even though NutraSweet's attorney later stated that the parties "have always been able to resolve their difference and maintain the good relationship that exists" (Mem. D.I. 7 at 4), he also expressed concern that Ajinomoto would escalate the matter "to a level where Ajinomoto formally provides a notice of breach" under the License Agreement and sought Ajinomoto's proposal for resolving the situation. (Tomioka Decl. D.I. 8, ¶ 8 & Ex. C; Hoster Decl. ¶ 13 & Ex. H). Only a month later, Ajinomoto issued a formal notice of breach to NutraSweet without proposing any resolution. (Hoster Decl. ¶¶ 14-15 & Ex. J). Ajinomoto thus used the mere possibility of termination of the License Agreement to extract concessions from NutraSweet, far in excess of any cure required under the License Agreement. (*See* Hoster Decl. ¶¶ 17-18; DeFer Decl. ¶ 4; Tomioka Decl. D.I. 8, Ex. C).

> (2)     Ajinomoto's Refusal Provide NutraSweet Any
>           Assurance Of Its Position On the Korean Issue
>           <u>Demonstrates A Reasonable Threat To NutraSweet.</u>

In August 2004, NutraSweet sought Ajinomoto's assurance that Ajinomoto would not terminate the License Agreement or take any other adverse action under the License Agreement based upon NutraSweet's export of Daesang-Manufactured Aspartame to the Excluded Territory. Not only did Ajinomoto refuse to give such assurances, but the immediate response of Ajinomoto's attorney was that NutraSweet needed a license to do so. (DeFer Decl. ¶ 8). Even the cases relied upon by Ajinomoto demonstrate that such conduct is relevant to establish an actual controversy. *See, e.g., TorPharm, Inc. v. Pfizer*

- 17 -

*Inc.*, No. 03-990-SLR, 2004 U.S. Dist. LEXIS 11930, at *32 (D. Del. June 28, 2004) (stating that defendant's failure to give requested assurance or covenant not to sue would be relevant to actual controversy determination, relying upon *BP Chems. Ltd.*, 4 F.3d at 978); *see also Millipore Corp. v. University Patents, Inc.*, 682 F. Supp. 227, 233 (D. Del. 1987) (holding that offer of a license is to be considered in determining whether reasonable threat exists). Given its past experience with the May 2002 Letter Agreement, as well as the increasing tensions relating to the pending patent litigation between the parties (*see* Section IV.A.1.b., *infra*), NutraSweet saw the writing on the wall. The additional—and in NutraSweet's eyes, unnecessary—license proposed by Ajinomoto would be negotiated on Ajinomoto's terms or none at all.

> (3)    Ajinomoto's Refusal To Reveal Its Intentions
> Heightens The Threat To NutraSweet.

The threat that Ajinomoto might terminate the License Agreement or sue for breach has become even greater since this suit was filed. In determining whether an actual controversy exists, whether a defendant is willing to state its intentions with respect to the matters at issue is relevant. *See Symbol Techs., Inc. v. Hand Held Prods., Inc.*, No. 03-102-SLR, 2003 WL 22750145, at *4 (D. Del. Nov. 14, 2003) (Robinson, J.) (finding it relevant that defendant would not affirmatively state at oral argument that it would not bring suit); *see also TorPharm, Inc.*, 2004 U.S. Dist. LEXIS 11930, at * 33-34. Ajinomoto has similarly concealed its intentions here. In response to phone conversations where counsel for Ajinomoto indicated that it might bring the instant motion, NutraSweet's counsel sent a letter offering to voluntarily dismiss this action if Ajinomoto acknowledged that the export of Daesang-Manufactured Aspartame to the Excluded Territory did not violate the License Agreement. (Wentzel Decl. ¶¶ 2-4 & Ex.

- 18 -

1). Ajinomoto never responded to NutraSweet's invitation. (*Id.*) *Cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (finding a justiciable case or controversy where the State did not disavow any intention of enforcing a criminal penalty statute against plaintiffs).

Ajinomoto's history of threatening to terminate the License Agreement to extract concessions from NutraSweet, its refusal to negotiate the matter as proposed by NutraSweet, and its continued concealment of its true intentions establish a threat of real and immediate harm in the absence of a judicial determination.

> b.    Ajinomoto's Lawsuits With Daesang and NutraSweet
>       Demonstrate The Parties' Adversity Of Interests.

Ajinomoto also argues that its lawsuits with Daesang (the "Daesang Litigation") fail to support finding of an actual controversy. At the same time, Ajinomoto fails to advise the Court of its current involvement in protracted patent litigation with NutraSweet. All of this litigation lends further support to finding that an actual controversy exists in this case.

As to the Daesang Litigation, Ajinomoto asserts that "[n]umerous courts have rejected a general history of litigation by a defendant against third parties as the lone basis for establishing an actual controversy." (Mem. D.I. 7 at 16). Ajinomoto's position is flawed in at least three respects. First, the Daesang Litigation is not NutraSweet's lone basis for establishing jurisdiction—Ajinomoto's prior issuance of a notice of breach of the License Agreement, its express objections and refusal to negotiate the Korean issue with NutraSweet, and its continued refusal to reveal its intentions are the primary basis for finding an actual controversy in this case. (*See* Section IV.B.1.a, *supra*). Second, while Daesang may have been a third-party at the time the Daesang Litigation was

- 19 -

pending, it is not now a third party as NutraSweet has acquired Daesang's Aspartame manufacturing facilities, including the very process that was at issue in the Daesang Litigation. Thus, the cases upon which Ajinomoto relies are distinguishable.[5] Third, the Daesang Litigation is not just a "general history"—each of the suits were specifically directed at NutraSweet's predecessor and arose out of the same Daesang Process being used by NutraSweet to manufacture Aspartame for export to Europe. (*See* Tomioka Decl. D.I. 8, ¶¶ 16-18; Hoster Decl. ¶ 19).

Relying on *Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985), Ajinomoto argues that the Daesang Litigation is too remote to be relevant. However, in *Indium Corp.*, the prior litigation had been filed seven years prior to the declaratory judgment action, settled in the years following, and involved parties that were unrelated to the declaratory plaintiff. *Id.* at 880-81. By contrast, each of the three lawsuits in the Daesang Litigation were filed only four years before this litigation and all three continued until 2003. (Tomioka Decl. D.I. 8, ¶¶ 16-18). Each of the three Daesang lawsuits were litigated to a final resolution, not settled, and each involved Daesang's aspartame manufacturing process, which now belongs to NutraSweet and is at issue here. (*See id.*)

Likewise, Ajinomoto's reliance on *Wright Med. Tech., Inc. v. Osteonics Corp.*, 914 F. Supp. 1524 (W.D. Tenn. 1995) is inappropriate, as the court in *Wright* found that

---

[5] *See Teva Pharms. USA, Inc. v. Pfizer Inc.*, 395 F.3d 1324, 1333-34 (Fed. Cir. 2005) (rejecting as basis for jurisdiction the general assertion that defendant aggressively asserted its patent rights against other alleged infringers of patents not at issue in case); *West Interactive Corp. v. First Data Res. Inc.*, 972 F.2d 1295, 1298 (Fed. Cir. 1992) (finding that litigation against unrelated third parties did not support jurisdiction); *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1212 (7th Cir. 1980) (finding that prior litigation between the parties was relevant but not dispositive); *TorPharm, Inc.*, 2004 U.S. Dist. LEXIS 11930, at *34-38 (finding that defendant was not engaged in a pattern of widespread litigation involving patent-in-suit against all manufacturers of generic drug); *DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*, 148 F. Supp. 2d 412, 415 (D. Del. 2001) (holding that suit between parties on unrelated patent failed to establish reasonable apprehension of suit on patent-in-suit).

the declaratory plaintiff in that case was only seven months old and had no prior history of conflict with the defendant. *Id.* at 1531-32. By contrast, NutraSweet and Ajinomoto have a history of litigation and threats of litigation. (*See* DeFer Decl. ¶¶ 3-6, 17-20).

Ajinomoto also misplaces reliance on *Teva Pharmaceuticals*, which involved a suit on the same patent against a third party unrelated to the declaratory plaintiff, along with the general allegation that the defendant had a history of aggressively asserting its patents against alleged infringers of other patents. *Teva Pharms.*, 395 F.3d at 1333-34. Here, Daesang is not a third party unrelated to NutraSweet, because NutraSweet is the successor to Daesang's Aspartame manufacturing facilities. Moreover, just as in this case, the Daesang Litigation involved Aspartame manufactured in accordance with the Daesang Process which was imported into countries in the Excluded Territory. (*See* Tomioka Decl. D.I. 8, ¶¶ 16-17). Thus, the Aspartame manufacturing process considered in the Daesang Litigation is the very same process at issue in this litigation.

*DuPont Dow* is also distinguishable because the defendant in that case repeatedly informed the plaintiff in writing that it was not charging plaintiff with infringement of the patent at issue. *DuPont Dow*, 148 F. Supp. 2d at 413-14. Thus, although the parties in *DuPont Dow* had previously engaged in litigation over an unrelated patent, this Court found no reasonable apprehension of suit "[i]n the absence of either an express threat to sue, a pattern of suing on the [patent at issue], or conduct which has interfered with [plaintiff's] customer relations." *Id.* at 415. Despite NutraSweet's request, Ajinomoto has not provided any assurances that it does not consider the export of Daesang-Manufactured Aspartame to the Excluded Territory to be a breach of the License Agreement. (DeFer Decl ¶ 8; Wentzel Decl. ¶¶ 2-4). To the contrary, Ajinomoto has

demanded that NutraSweet obtain a license to do so. (DeFer Decl. ¶ 8). Further, the Daesang Litigation involved patents related to those at issue here as they are all directed towards the manufacture of Aspartame. (Tomioka Decl. D.I. 8, ¶¶ 16-18). Under these circumstances, the Daesang Litigation lends further support to finding an actual controversy.

Moreover, Ajinomoto and NutraSweet themselves are currently engaged in litigation. Although Ajinomoto is technically correct in its carefully parsed assertion that there has been no litigation with NutraSweet specifically involving Aspartame, the parties have nonetheless engaged in various patent suits over the past three years involving blends of the artificial sweeteners neotame, Aspartame and acesulfame K. To this day, these actions are pending in the USPTO and the Federal Court of Australia. (DeFer Decl. ¶¶ 17-20). Ajinomoto concedes that ongoing litigation between the parties over a series of closely-related patents involving the same technology is sufficiently threatening. (*See* Mem. D.I. 7 at 18-19 (citing *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 954 (Fed. Cir. 1987)). This ongoing litigation therefore provides additional support for finding jurisdiction.

          c.       The History Of The License Agreement Objectively
                   Establishes An Actual Controversy.

Ajinomoto finally asserts that the parties "have a long history of amicable dispute resolution and negotiation over interpretation or possible breaches of the License Agreement." (Mem. D.I. 7 at 19). Of course, this assertion may be true from Ajinomoto's perspective, given that historically it has been able to settle such disputes on its terms. (*See* Hoster Decl. ¶¶ 16-18). Yet, when NutraSweet has not immediately

assented to Ajinomoto's terms, Ajinomoto has taken action to terminate the License Agreement. (*See* Hoster Decl. ¶ 15).

Ajinomoto relies on various oral and written exceptions to the License Agreement regarding sales of encapsulated Aspartame to Cadbury as evidence of its reasonableness. (Mem. D.I. 7 at 5-6). Ajinomoto neglects to mention that at all relevant times NutraSweet has been the only manufacturer of encapsulated Aspartame in the world, that it had been supplying Cadbury with encapsulated Aspartame since the early 1990s, and that NutraSweet's ability to continue doing so was part of the negotiations for the License Agreement. (DeFer Decl. ¶¶ 13-15). Thus, had Ajinomoto refused to allow NutraSweet to supply encapsulated Aspartame to Cadbury, Ajinomoto risked antagonizing one of its own customers. (*See* DeFer Decl. ¶ 15). These facts fail to support Ajinomoto's claim of "fair and reasonable dealing."

Given these additional facts, Ajinomoto's claim that it has "a demonstrated history of a willingness ... to negotiate in good faith" rings hollow. (Mem. D.I. 7 at 20). The adversity of interests prong is thus satisfied under these facts.

> ### 2. Because The Factual Predicate For This Action Is Complete, A Declaratory Judgment Would Be Conclusive.

*Step-Saver*'s conclusiveness prong ensures that a declaratory judgment action is "based on a real and substantial controversy admitting of specific relief through a decree of a conclusive character." *Armstrong World Indus.*, 961 F.2d at 412. This element focuses on "whether judicial action at the present time would amount to more than an advisory opinion based on a hypothetical set of facts." *Moore Corp.*, 898 F. Supp. at 1097. This element seeks to avoid a declaratory judgment being granted "in the absence of a concrete set of facts," such that applying the judgment to subsequently arising

- 23 -

controversies would be an "exercise in futility." *Armstrong World Indus.*, 961 F.2d at

412 (quoting *Step-Saver*, 912 F.2d at 648).

The facts of *Step-Saver* illustrate a situation where the requested declaratory

judgment would not have been conclusive. The plaintiff in that case sold packaged

computer systems comprised of hardware and software supplied by the defendants. *Step-*

*Saver*, 912 F.2d at 645. Certain of plaintiff's customers' sued plaintiff, alleging that the

computer systems were defective. *Id.* Plaintiff sought a declaratory judgment that

defendants were liable to plaintiff if the plaintiff's customers lawsuits established that the

products supplied by defendants were defective. *Id.* The court found jurisdiction lacking

because the requested judgment was based on the contingency that the collateral lawsuits

established a defect in the defendant's products. *Id.* at 648. Thus, even if the requested

declaration were issued, it would have no effect unless that contingency were fulfilled.

*Id.* Moreover, even if the contingency were fulfilled, the conclusiveness of a declaratory

judgment would have been questionable because the nuances of the collateral suits could

make it difficult to apply in any event. *See id.*

The conclusiveness issues present in *Step-Saver* are not present here. Indeed,

Ajinomoto does not argue that a judgment in this case would be merely advisory. The

factual predicate for NutraSweet's claim is complete. The sole issue for this Court to

decide is whether NutraSweet's continuation of Daesang Corporation's previous export

to the Excluded Territory of Daesang-Manufactured Aspartame constitutes a breach of

the License Agreement. None of the facts material to this issue are contingent—the

Daesang Process is what it is, as are the terms of the License Agreement, and NutraSweet

has exported Daesang-Manufactured Aspartame to several countries located in the

Excluded Territory. (*See* DeFer Decl. ¶ 11). Accordingly, there can be no question that a judgment rendered in this matter would be conclusive, and not advisory, and thus the second *Step-Saver* requirement is satisfied.

### 3.    A Declaratory Judgment Would Directly Affect The Future Actions Of The Parties.

The final *Step-Saver* consideration is whether the declaratory judgment would be useful and of practical help to the parties. *Moore Corp.*, 898 F. Supp. at 1098. This prong also considers the hardship to the parties that would result from the Court's refusal to grant relief. *Grace Holdings*, 901 F. Supp. at 862. As the *Step-Saver* court noted, "[t]he idea behind the [DJA] was to clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future." *Step-Saver*, 912 F.2d at 649; *see also Envirometrics Software, Inc. v. Georgia-Pacific Corp.*, No. 97-243-SLR, 1997 U.S. Dist. LEXIS 17659, *8 (D. Del. Nov. 4, 1997) (Robinson, J.) ("Declaratory relief is appropriately awarded when it will serve a useful purpose in clarifying the legal relations in issue or terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." (internal citations omitted)).

"[T]he proper focus of the utility inquiry is the effect of a declaratory judgment on the parties' plans of action." *Armstrong World Indus.*, 961 F.2d at 423; *Moore Corp.*, 898 F. Supp. at 1098. In *Moore Corp.*, the court found this element satisfied because a declaration in that case that the plaintiff's conduct violated applicable securities and antitrust laws would have required plaintiff to "revise its proposed course of conduct to remedy or preempt its legal violations." *Id.* Likewise, in this case, a declaration that the export of Daesang-Manufactured Aspartame to the Excluded Territory does not breach the License Agreement will permit NutraSweet to continue exporting such Aspartame to

the Excluded Territory without fear that Ajinomoto will terminate the License

Agreement.  Conversely, a declaration that such conduct amounts to a breach will require

NutraSweet to take some action, whether it be halting exports to the Excluded Territory

altogether, redesigning the Daesang Process, or some other option, such that it does not

breach the License Agreement.

Accordingly, the factual basis for NutraSweet's action satisfy all three criteria

considered by the Third Circuit in *Step-Saver*, thus establishing "an actual controversy"

under the DJA.  Hence, this Court has jurisdiction over this action.

### C.    DISCRETIONARY DISMISSAL OF THIS ACTION WOULD BE IMPROPER.

Ajinomoto urges that even if this case presents an "actual controversy," this Court

should exercise its discretion to decline jurisdiction over this action.  (Mem. D.I. 7 at 20-

22).  As the Third Circuit and the cases cited by Ajinomoto recognize, however, district

courts do not have "open-ended discretion" to dismiss declaratory judgment actions.

*State Auto Ins. Cos. v. Summy*, 234 F.3d 131, 134-35 (3d Cir. 2000); *see also EMC Corp.*

*v. Norand Corp.*, 89 F.3d 807, 813 (Fed. Cir. 1996) ("EMC is correct in contending that

the district court's discretion is not unfettered.").  Accordingly, the Third Circuit has

indicated that discretionary dismissal of declaratory judgment actions is proper to avoid

"duplicative and piecemeal litigation" or where "the state law involved is close or

unsettled." *Summy*, 234 F.3d at 135; *see also United States Aircraft Ins. Group v.*

*Dwiggins, L.L.C.*, No. 03-173-SLR, 2004 U.S. Dist. LEXIS 266, at *8 (D. Del. Jan. 5,

2004) (Robinson, J.).

Ajinomoto does not assert that either of these circumstances are present. Rather, it claims only that NutraSweet "raced to the courthouse" in order to garner some unidentified advantage. Ajinomoto's argument is without merit.

Implicit in Ajinomoto's reliance on *Davox Corp. v. Digital Sys. Int'l, Inc.*, is the argument that NutraSweet filed this action in order to obtain a more convenient forum. *See* 846 F. Supp. 144, 148 (D. Mass. 1993) ("Davox filed this action in an evident effort to obtain a forum more convenient to it than the Western District of Washington."). However, forum shopping is not an issue in this case. The parties previously selected this Court as the appropriate forum in the License Agreement. (Compl. D.I. 1, ¶ 13; License Agreement, §9.6(b)). Thus, regardless of whether this action for declaratory judgment goes forward or Ajinomoto later sues for breach of the License Agreement, these issues will undoubtedly be before this Court.

Ajinomoto's argument also implies that the DJA requires a certain amount of pre-suit negotiations between the parties if there is a "real prospect of non-judicial resolution." (Mem. D.I. 7 at 22 (citing *EMC Corp.*, 89 F.3d at 814)). However, there is no such requirement, and the cases cited by Ajinomoto do not support this position. Indeed, the facts also fail to support Ajinomoto's contention that this case presents a "real prospect" of resolution outside of litigation. Ajinomoto has refused to provide any assurance to NutraSweet that it does not consider the conduct at issue in this case to breach the License Agreement (DeFer Decl. ¶ 8); it has expressly demanded that NutraSweet obtain a license to engage in such conduct (*id.*); and it has refused to negotiate the issue on the terms proposed by NutraSweet (DeFer Decl. ¶ 9). Further,

Ajinomoto has previously used its leverage under the License Agreement to extract more than that to which it is entitled. (*See* Hoster Decl. ¶¶ 16-18).

The DJA was designed to prevent such conduct. *Cf. Arrowhead*, 846 F.2d at 735 ("Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue."). Given this history, NutraSweet has acted properly to file this declaratory judgment action. There are no grounds for this Court to exercise its discretion to dismiss this case.

Ajinomoto also relies on *EMC Corp. v. Norand Corp.*, to argue that NutraSweet's filing of this action is designed to obtain a "tactical advantage in negotiations" with Ajinomoto. (Mem. D.I. 7 at 22). However, *EMC Corp.* is inapplicable to the facts of this case. The defendant in *EMC* owned several patents for disk drive storage systems, but did not manufacture such systems. *EMC Corp.*, 89 F.3d at 809. The defendant believed that the plaintiff, a manufacturer of disk drive storage systems, was infringing the patents and suggested that it negotiate a license for the defendant's patents. *Id.* In the course of those negotiations, the defendant informed the plaintiff that it was also planning on negotiating licenses for the patents with six of the plaintiff's competitors. *Id.* Three days after learning this information, the plaintiff filed a lawsuit seeking a declaration that the defendant's patents were invalid and that it did not infringe the patents. *Id.* Finding that the plaintiff's lawsuit was an improper attempt to improve its bargaining position with defendant vis-à-vis the other potential licensees, e.g. the plaintiff's lawsuit might negatively affect the market for defendant's patents, the district court exercised its discretion and declined jurisdiction. *Id.* at 809-10. The Federal Circuit affirmed the district court, finding that "a court may take into account the pendency of *serious*

negotiations to sell or license a patent" when considering its jurisdiction under the DJA. *Id.* at 814 (emphasis added) (relying on *Davox Corp.*, 846 F. Supp. at 148).

The facts in this case are vastly different from those in *EMC*. The only "tactical advantage" NutraSweet seeks is that expressly permitted by the DJA—a judicial clarification of NutraSweet's rights and obligations under the License Agreement. Moreover, once Ajinomoto rejected NutraSweet's proposal for discussing the Daesang-Manufactured Aspartame issue, there were no further negotiations between the parties. (Tomioka Decl. D.I. 8 ¶ 24). Thus, it is unclear what "serious negotiations" exist that Ajinomoto wants this Court to consider in exercising its discretion. *See EMC Corp.*, 89 F.3d at 814. Because none of the bases considered by the *EMC* court in declining jurisdiction are present in this case, Ajinomoto's assertion of "procedural fencing" is baseless and should be rejected.

Because Ajinomoto has not established any appropriate basis recognized by the Third Circuit for this Court to decline jurisdiction over this matter, Ajinomoto's request for discretionary dismissal should be rejected.

## V.    CONCLUSION

For the reasons stated herein, the Motion of Defendant Ajinomoto Co., Inc. to Dismiss should be denied.

Respectfully submitted,

THE NUTRASWEET COMPANY

By: _____ (#663)
One of its attorneys

CO-COUNSEL:

MCDERMOTT WILL & EMERY LLP
Steven P. Handler
David F. Wentzel
John P. Killacky
Jeremy Root
227 West Monroe Street
Chicago, IL 60606
(312) 372-2000
shandler@mwe.com
dwentzel@mwe.com
jkillacky@mwe.com
jroot@mwe.com

PRICKETT, JONES & ELLIOTT, P.A.
James L. Holzman (#663)
Gary F. Traynor ( (#2131)
J. Clayton Athey (#4378)
1310 King Street
Wilmington, Delaware 19801
(302) 888-6500
jlholzman@prickett.com
gftraynor@prickett.com
jcathey@prickett.com

*Attorneys for Plaintiff,*
*The NutraSweet Company*

Dated: July 11, 2005

CHI99 4491078-4.058468.0018

- 30 -

## CERTIFICATE OF SERVICE

I, James L. Holzman, hereby certify that on July 11, 2005, I electronically filed the foregoing **PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** with the Clerk of the Court using CM/ECF, which is available for viewing and downloading, and which will send notification of such filing to the following counsel of record:

> Peter J. Walsh, Jr., Esquire
> Potter Anderson & Corroon, LLP
> 1313 North Market Street
> P. O. Box 951
> Wilmington, DE 19899-0951
> pwalsh@potteranderson.com

> James L. Holzman (Bar ID #663)
> Prickett, Jones & Elliott, P.A.
> 1310 King Street
> P.O. Box 1328
> Wilmington, DE 19899
> (302) 888-6509
> jlholzman@prickett.com
> *Attorneys for Plaintiff,*
> *The NutraSweet Company*