IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NUTRASWEET COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-318 (SLR) |
| | ) | |
| AJINOMOTO CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF WILLIAM L. DEFER

1.  My name is William L. DeFer. I am currently President and Chief Operating Officer of The NutraSweet Company ("NutraSweet"), and have been since 2004. Prior to 2004, I held the position of President of the Core Products business unit of NutraSweet. I have been employed by NutraSweet or its predecessors since 1994. At all relevant times, I have been familiar with the Release and License Agreement dated May 25, 2000 ("License Agreement") between NutraSweet and Ajinomoto Co., Inc. ("Ajinomoto"). As to the negotiations and communications specifically referred to herein, unless otherwise stated I was personally involved in those negotiations and communications in my capacity as an officer of NutraSweet or its predecessors.

2.  The facts stated herein are based upon my personal knowledge and review of NutraSweet's business documents. If called to testify about the facts stated in this declaration, I could competently do so.

    A.  **Historical Context and Purpose of the License Agreement.**

3.  The License Agreement was negotiated as part of a transaction in May 2000 whereby Monsanto divested itself of its Aspartame manufacturing business. The

divestiture of Monsanto's U.S.-based Aspartame manufacturing business ("NSC") was completed through the sale of NSC to a private party, and the resulting entity became NutraSweet. As part of that sale, Monsanto assigned all of its rights under the License Agreement to NutraSweet and NutraSweet assumed all of Monsanto's obligations thereunder.

4.  One of the purposes of the License Agreement was to continue prior licenses pursuant to which Monsanto's U.S.-based Aspartame manufacturing business ("NSC") had used certain of Ajinomoto's patents in its Aspartame manufacturing process in the Augusta facility. The patents licensed under the License Agreement are listed on Exhibits A and A-2 to the License Agreement. Since May 2000, NutraSweet has continued to manufacture Aspartame at the Augusta facility using certain of the licenses granted under the License Agreement. If Ajinomoto were to terminate the License Agreement, NutraSweet would be unable to continue using its current Aspartame manufacturing process, and could be put out of business. Further, when Ajinomoto has threatened to terminate the License Agreement in the past, such threats have caused NutraSweet serious problems in its relationships with customers and creditors. Ajinomoto has demonstrated by its conduct in various negotiations that it is well-aware of the importance of the License Agreement to NutraSweet's business.

5.  The other primary purpose of the License Agreement was to release Monsanto, NSC and NutraSweet from any claims or liabilities arising out of long history of intellectual property disputes between Ajinomoto, on the one hand, and Monsanto and NSC, on the other, and thus facilitate the sale by Monsanto of NSC based on Monsanto's reasonable belief that it would be difficult to divest NSC without resolution of these

items. Prior to 2000, Ajinomoto had a history of accusing Monsanto and NSC of using technology owned by Ajinomoto that Ajinomoto had not licensed for use by Monsanto or NSC. For example, Ajinomoto claimed in or about 1987 that Monsanto and NSC had appropriated certain of Ajinomoto's proprietary technology to build an Aspartame manufacturing facility in Augusta, Georgia (the "Augusta facility"). In or around 1994, Ajinomoto again threatened NSC with litigation related to the infringement of various patents related to the manufacture of Aspartame.

6.  Even after the announcement of Monsanto's intent to divest itself of NSC in 1999, Ajinomoto renewed its threats of patent infringement litigation related to NSC's Aspartame manufacturing process. In light of this history of threatening conduct related to its intellectual property, Monsanto and Ajinomoto negotiated the release of potential claims that Ajinomoto had previously asserted. The patents covered by that release are identified in Exhibit C to the License Agreement. The release thus facilitated Monsanto's sale of NSC to a private party.

**B.  Discussions Related To Export Of Daesang-Manufactured Aspartame To Europe.**

7.  In the summer of 2004, NutraSweet was in the process of integrating the newly acquired Aspartame manufacturing facilities located in Gunsan, Korea from Daesang Corporation (the "Daesang Process") into NutraSweet's global supply chain.

8.  Around that same time, Ajinomoto approached NutraSweet about purchasing Aspartame from NutraSweet to cover a shortfall in Ajinomoto's capacity. At a meeting in August 2004 between Ajinomoto and NutraSweet regarding the contemplated supply arrangement, NutraSweet proposed that it would sell Aspartame to Ajinomoto if the parties could reach agreement on two issues. First, NutraSweet wanted

to enter into mutual licensing agreements with Ajinomoto in order to resolve pending litigation and other adversarial actions between the parties involving patents related to blends of the artificial sweetener, neotame. Second, NutraSweet informed Ajinomoto that it intended to export Aspartame manufactured in Korea in accordance the Daesang Process to Europe, and sought Ajinomoto's assurance that Ajinomoto would not terminate the License Agreement or take any other adverse action under the License Agreement based upon the export of such Aspartame. At that meeting, Ajinomoto's attorney, Ms. Fumiko Takahashi, responded that Ajinomoto would not give such assurances and that NutraSweet needed to obtain a license from Ajinomoto in order to export Aspartame manufactured in Korea in accordance with the Daesang Process to Europe.

9. The negotiations regarding Ajinomoto's purchase of Aspartame from NutraSweet continued through November 2004. Throughout those negotiations, NutraSweet sought to resolve license issues related to the export of Korean-produced Aspartame, and Ajinomoto insisted on negotiating this issue separately from the ongoing purchase negotiations.

10. NutraSweet did not believe at the time, nor has it ever believed that it needed a license to export Aspartame manufactured in Korea in accordance with the Daesang Process to Europe or any other part of the Excluded Territory.

11. In May 2005, NutraSweet accepted a purchase order from a customer located in the Czech Republic. Since NutraSweet filed its Complaint in this matter, NutraSweet filled this purchase order with Aspartame manufactured in Korea in accordance with the Daesang Process. Additionally, NutraSweet has delivered

Aspartame manufactured in Korea in accordance with the Daesang Process to fill purchase orders from customers located in Spain, Portugal, Hungary, Poland, Russia, Belarus and Ukraine, all countries listed in the Excluded Territory.

### C. Exceptions To License Agreement Involving Encapsulated Aspartame.

12.     I understand that Ajinomoto relies upon certain exceptions it has granted to the License Agreement's export restrictions involving NutraSweet's sales of encapsulated Aspartame to one company, Comptoir de la Confiserie, Membre Due Group Cadbury Schweppes ("Cadbury"), located in France.  From May 2000 through present, these sales have constituted less than 0.2 % of NutraSweet's total sales volume of Aspartame products.

13.     Encapsulated Aspartame is a special type of Aspartame wherein the Aspartame grains are surrounded by other materials which make the Aspartame more heat resistant and less susceptible to degradation.

14.     I believe NutraSweet to be only producer of Aspartame in the world that produces an encapsulated form of Aspartame.

15.     NutraSweet has been supplying Cadbury (and its predecessors) with encapsulated Aspartame since the early 1990s.  Prior to May 2000, NutraSweet supplied encapsulated Aspartame to NutraSweet A.G. (its European joint venture with Ajinomoto), who then supplied Cadbury (and its predecessors).  After Monsanto divested itself of its Aspartame manufacturing business, the agreement to permit NutraSweet to continue supplying Cadbury was the only viable solution, given that there was no other source of supply of encapsulated Aspartame for Cadbury, and its operations would have

been disrupted otherwise. Cadbury purchases regular, but not encapsulated, Aspartame from Ajinomoto.

16.     In December 2003, Ajinomoto permitted NutraSweet to sell encapsulated Aspartame to other customers located in the Excluded Territory. However, NutraSweet has never done so.

### D.    Pending Litigation Between Ajinomoto and NutraSweet.

17.     Since 2003, Ajinomoto and NutraSweet have been actively involved in litigation involving intellectual property rights related to blends of artificial sweeteners, including neotame, Aspartame, and acesulfame K.

18.     Specifically, in June 2003, Ajinomoto initiated an interference between one of its patent applications and a NutraSweet patent in the U.S. Patent and Trademark Office. On July 30, 2004, the U.S. Patent and Trademark Office declared the interference between the parties to determine validity and priority to the inventions claimed by the respective parties in the respective patent application and patent. The proceeding is ongoing. *Ajinomoto Co., Inc. v. The NutraSweet Company*, United States Patent and Trademark Office, Board of Patent Appeals and Interferences, Patent Interference No. 105,246 (RES).

19.     On August 10, 2004, NutraSweet, by and through their counsel, filed Reexamination Requests of U.S. Patent Nos. 6,372,278 B1 and 6,372,279 B1 before the U.S. Patent and Trademark Office. These patents are owned by Ajinomoto. On October 7, 2004, the U.S. Patent and Trademark Office ordered reexamination of these patents under Reexamination Control No. 90/007,164 and 90/007,160, respectively, and these proceedings are ongoing.

20. In 2002, The NutraSweet Australia Pty. Ltd. (a subsidiary of The NutraSweet Company) requested the Australian authority to revoke an Australian patent owned by Ajinomoto (Australian Patent No. 727199). *NutraSweet Australia Pty. Ltd., v. Ajinomoto Co., Inc.*, The Federal Court of Australia (Victoria) Proceeding No. V174 of 2002.

21. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 11, 2005              /s/ William L. DeFer
                                       William L. DeFer

CHI99 4494817-1.058468.0018

## **CERTIFICATE OF SERVICE**

I, James L. Holzman, hereby certify that on July 11, 2005, I electronically filed the foregoing **DECLARATION OF WILLIAM L. DeFER** with the Clerk of the Court using CM/ECF, which is available for viewing and downloading, and which will send notification of such filing to the following counsel of record:

>Peter J. Walsh, Jr., Esquire
>Potter Anderson & Corroon, LLP
>1313 North Market Street
>P. O. Box 951
>Wilmington, DE 19899-0951
>pwalsh@potteranderson.com

>James L. Holzman (Bar ID #663)
>Prickett, Jones & Elliott, P.A.
>1310 King Street
>P.O. Box 1328
>Wilmington, DE 19899
>(302) 888-6509
>jlholzman@prickett.com
>*Attorneys for Plaintiff,*
>*The NutraSweet Company*