IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NUTRASWEET COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>AJINOMOTO CO., INC.,<br><br>    Defendant. | Civil Action No. 05-318 (SLR) |

## DECLARATION OF JOSHUA H. RAWSON

1. My name is Joshua H. Rawson. I am Counsel with the law firm of Cleary Gottlieb Steen & Hamilton LLP.

2. I acted as outside counsel to Ajinomoto Co., Inc. ("Ajinomoto") in connection with discussions with representatives of NutraSweet Corporation ("NutraSweet") between December 2001 and August 2002 relating to NutraSweet's participation in the export of aspartame to Europe in violation of the terms of the Release and License Agreement (the "License Agreement"), which discussions led to the execution of a Letter Agreement dated May 1, 2002 (the "2002 Letter Agreement"). In the context of that representation, I became familiar with the terms of the License Agreement dated May 25, 2000 between Monsanto Company ("Monsanto"), its then subsidiary NutraSweet, and Ajinomoto.

3. Unless stated otherwise, I make this declaration based on my personal knowledge of the matters addressed herein, including my knowledge of the documents cited herein and attached hereto. I could competently testify if called to testify about the matters addressed herein.

4. Between December 2001 and August 2002, I participated in three settlement meetings and numerous telephone conversations with NutraSweet's General Counsel, David Bowman. In his declaration, Mr. Hoster states that in this period he "participated in numerous communications and meetings between NutraSweet and Ajinomoto related to the License Agreement." (Hoster Decl. D.I. 11 ¶ 3.) In fact, Mr. Hoster was present at only one of these meetings. At another meeting between Mr. Bowman and myself, Mr. Hoster listened by telephone. To my knowledge, Mr. Hoster did not participate in any of the conference calls between Mr. Bowman and myself.

5. Mr. Hoster states in his declaration that at a meeting with Mr. Bowman on December 21, 2001, I threatened NutraSweet with patent litigation. (Hoster Decl. D.I. 11 ¶ 9.) As discussed in greater detail below, this is a wholly inaccurate characterization of my comments at the meeting in question. Indeed, throughout the period, Ajinomoto's discussions with NutraSweet were extremely amicable. Mr. Bowman repeatedly expressed his gratitude that Ajinomoto was taking a constructive approach to resolve the dispute in an amicable fashion, and noted in more than one letter "NutraSweet and Ajinomoto have always been able to resolve their differences and maintain the good relationship that exists." (*See* Bowman Letter to Kono dated 2/28/02, attached to Hoster Decl. D.I. 11 as Ex. H; Bowman Letter to Kono dated 3/27/02, attached to Hoster Decl. D.I. 11 as Ex. I.)

6. As discussed below, Ajinomoto resolved this dispute with NutraSweet through negotiations and a settlement agreement, notwithstanding the fact that Ajinomoto had clear and strong evidence that NutraSweet had knowingly

participated in the export of aspartame to customers in Europe in violation of the field of use and territorial restrictions in the License Agreement.

7.  On information and belief, the License Agreement was negotiated by representatives of Ajinomoto and Monsanto, which at the time was NutraSweet's parent. Under the terms of the License Agreement, Monsanto and NutraSweet were granted a license under Ajinomoto's U.S. patents to manufacture aspartame for sale in certain licensed territories – principally North America. The agreement prohibited Monsanto and NutraSweet from exporting aspartame to the "Excluded Territory" identified in Exhibit B to the License Agreement, which included countries in Europe and several other regions. (License Agreement § 2.3, attached to Tomioka Decl. D.I. 8 as Ex. B.)

8.  In or about the summer of 2001, Ajinomoto received a copy of a letter sent by Craig Petray, Vice President of NutraSweet, to Deborel Maroc, a company located in Casablanca, Morroco. Morocco is within the Excluded Territory under the License Agreement. In this letter, NutraSweet advised that it could not sell NutraSweet-brand aspartame directly to Deborel Maroc in Morocco. Nonetheless, NutraSweet suggested that it "would be happy to assist" Deborel Maroc in locating a "third party" willing to supply NutraSweet-brand aspartame in Morocco. NutraSweet directed Deborel Maroc to contact Vopak Chemical Distribution Europe B.V. in the Netherlands. A copy of this letter is attached hereto as Exhibit A.

9.  In addition, publicly-available pier export records showed that 33.75 metric tons of aspartame had been shipped in June 2001 from Charleston, South Carolina to Gothenberg, Sweden. A copy of the Piers Reports for June 2001 is attached

hereto as Exhibit B. NutraSweet's aspartame plant is located in Augusta, Georgia, which is in close proximity to Charleston. Sweden is within the Excluded Territory under the License Agreement. Records showed that the container went directly from NutraSweet's plant to the port for shipment to MB Sweda in Gothenberg.

        10.    Ajinomoto learned that MB Sweda was a wholly-owned subsidiary of Royal Vopak and that Royal Vopak had a subsidiary in the U.S. called Vopak U.S.A.

        11.    Export records showed a further shipment on September 22, 2001 of 11.25 metric tons of aspartame granules from Charleston, South Carolina to Gothenberg, Sweden, and in July 2001 of 6.47 metric tons of aspartame from New Orleans, Louisiana to Ashdod, Israel. Israel is within the Excluded Territory under the License Agreement.

        12.    Around the same time, an Ajinomoto customer located in Spain purchased aspartame manufactured in the U.S. by NutraSweet. This was confirmed when Ajinomoto obtained copies of the container labels, which indicated manufacture in Augusta, Georgia, USA, lot number A10413. A copy of the container label is attached hereto as Exhibit C. A "Certificate of Analysis" showed that lot A10413 was manufactured by NutraSweet in Augusta, Georgia. A copy of the Certificate of Analysis is attached hereto as Exhibit D. Spain is within the Excluded Territory under the License Agreement.

        13.    The evidence discussed above showed that NutraSweet was actively participating in the export of aspartame to the Excluded Territory, which was a violation of Section 2.3 of the License Agreement. Notwithstanding the evidence

obtained, Ajinomoto initiated discussions with NutraSweet, to provide NutraSweet with the opportunity to explain its conduct.

14. By letter dated December 5, 2001, from Dr. Tetsuo Kono of Ajinomoto to NutraSweet's General Counsel David Bowman, Ajinomoto requested a meeting with NutraSweet. (Kono Letter to Bowman dated 12/5/01, attached to the Hoster Decl. D.I. 11 as Ex. B.)

15. On December 21, 2001, I attended a meeting between Dr. Hajimu Morioka and Mr. Tomomi Miyama, of Ajinomoto, and Mr. Bowman and Jeffrey Hoster, of NutraSweet. At this meeting, Dr. Morioka reported to Mr. Bowman and Mr. Hoster that Ajinomoto had learned that NutraSweet was participating in the export of U.S. manufactured aspartame to Europe, which was prohibited under the License Agreement. We provided Mr. Bowman with the aforementioned cargo tracking documentation showing shipments of aspartame in June and September 2001 from South Carolina to Sweden.

16. Mr. Bowman said that he did not have any personal knowledge regarding these shipments, but said he would investigate promptly whether NutraSweet had participated in these shipments. Mr. Bowman also reported that NutraSweet had "considered options" that it might have to "legally compete" with Ajinomoto in the Excluded Territory. He offered his view that the License Agreement only prohibited NutraSweet from selling aspartame directly to European customers, and that the license would not be violated if NutraSweet's U.S. customer resold the product to a European customer, even if NutraSweet was aware of the U.S. customer's intent to transfer the product to Europe. In response, I explained that it was Ajinomoto's understanding that

5

Section 2.3 of the License Agreement prohibited NutraSweet from either directly or indirectly exporting aspartame to the Excluded Territory. I also explained that Ajinomoto disputed his suggestion that sales by NutraSweet to a European customer through a U.S intermediary was a "legal" option. I noted that the License Agreement granted only limited rights under Ajinomoto's patents – *i.e.*, the right to sell in the licensed territories – and granted no rights whatsoever under Ajinomoto's patents in the Excluded Territory. Thus, any sales to non-U.S. customers were outside the scope of the license and would violate the U.S. patents, while any use of such aspartame in Europe would violate Ajinomoto's European patents.

17. At all times, our discussion was amicable. Both parties expressed a desire to discuss the respective positions of our clients. At no time did I, or anyone else from Ajinomoto, threaten to bring a patent infringement suit against NutraSweet. Our meeting ended amicably, with Mr. Bowman committing to investigate the matter and to provide us with a prompt report.

18. By letter dated January 11, 2002, Mr. Bowman reported to Ajinomoto that NutraSweet "did not export the product in question to Sweden," but did confirm that the product referenced in the cargo documents was product that NutraSweet had sold "to a customer located in the United States." Mr. Bowman refrained from identifying the customer in question. Mr. Bowman stated NutraSweet's view that it had not violated the License Agreement, but said that if Ajinomoto had any further concerns, NutraSweet was prepared to meet again to discuss "possible amicable solutions." (Bowman Letter to Kono dated 1/11/02, attached to the Hoster Decl. D.I. 11 as Ex. F.)

19. I spoke with Mr. Bowman by phone on February 1, 2002. Mr. Hoster did not participate in this call. Mr. Bowman and I discussed the possibility of meeting in mid-February. We again agreed that the parties should try to reach an amicable solution of the present issue. Mr. Bowman asked that we provide further information regarding the shipments at issue, and regarding Ajinomoto's understanding of the meaning of the License Agreement.

20. By letter dated February 14, 2002, Dr. Kono wrote to Mr. Bowman to confirm that it was Ajinomoto's view that an indirect export by NutraSweet to Europe violated Section 2.3 of the License Agreement, and infringed Ajinomoto's U.S. and European patents. He also disclosed that Ajinomoto had learned that the product was being shipped directly from NutraSweet's plant to Europe. Mr. Kono reported that in the negotiation of the License Agreement between Ajinomoto and Monsanto, the parties had expressly discussed that the licensees would not be permitted to export to the Excluded Territory through an intermediary company. (Kono Letter to Bowman dated 2/14/02, attached to Hoster Decl. D.I. 11 as Ex. G.)

21. On February 20, 2002, Mr. Morioka, Mr. Miyama and I met with Mr. Bowman. Mr. Hoster did not attend the meeting in person, but participated by conference call. At this meeting, Mr. Bowman reiterated the view that the License Agreement only restricted direct exports by NutraSweet to the Excluded Territory, but permitted NutraSweet to sell to a U.S. customer even though NutraSweet knew that the customer would resell the product in the Excluded Territory. Mr. Bowman admitted that NutraSweet representatives had not participated in the negotiation of the License

Agreement, but reported that he recently had conferred with Mr. Scott Falk who had negotiated on behalf of Monsanto.

22. In response, I disclosed to Mr. Bowman that Ajinomoto had learned that the customer in Sweden was M.B. Sweda, which was the affiliate of NutraSweet's U.S. distributor Vopak U.S.A. I also reported that Ajinomoto was aware that the product had been picked up at NutraSweet's Augusta plant and then shipped directly to Sweden. I emphasized that this demonstrated that NutraSweet was knowingly participating directly in the export of aspartame to the Excluded Territory.

23. I also disclosed to Mr. Bowman that, prior to the execution of the License Agreement, Monsanto and Ajinomoto had specifically discussed that the prohibition on exporting to the Excluded Territory would prohibit the licensees from selling to customers in the Excluded Territory through a U.S. intermediary. I cited conference calls on this subject between Monsanto and Ajinomoto on November 24-25, 1999 and again on May 12, 2000, during which it was specifically agreed that NutraSweet was not permitted to sell to an intermediary located in the licensed territory that NutraSweet knew intended to export the product to the Excluded Territory. I also provided to Mr. Bowman a copy of letter from Mr. Takahashi to Mr. Falk of Monsanto dated May 9, 2000, which was just prior to the execution of the License Agreement, in which Ajinomoto stated as follows:

> [i]t is Ajinomoto's understanding that, after the closing, NutraSweet Company will not be able to sell aspartame to users, such as Wrigley, which are known to export the aspartame to Europe, regardless whether its origin is Ajinomoto or Monsanto.

A copy of this letter is attached hereto as Exhibit E.

24. By letter dated February 28, 2002 to Dr. Kono, Mr. Bowman advised Ajinomoto that NutraSweet maintained its position that the License Agreement only restricted direct exports by NutraSweet. (Bowman Letter to Kono dated 2/28/02, attached to the Hoster Decl. D.I. 11 as Ex. H.)

25. By letter dated March 27, 2002, to NutraSweet President Nick Rosa and copied to Mr. Bowman, Ajinomoto issued a notice of breach reflecting its understanding that such ongoing participation by NutraSweet in exports to the Excluded Territory violated Section 2.3 of the License Agreement. (Kono Letter to Rosa dated 3/27/02, attached to the Hoster Decl. D.I. 11 as Ex. J.)

26. On the same date, Mr. Bowman had sent a letter to Dr. Kono restating the view that the License Agreement only prohibited direct exports. He also reported that "for reasons unrelated to the issues raised by Ajinomoto" NutraSweet had decided to end the shipments objected to by Ajinomoto. (Bowman Letter to Kono dated 3/27/02, attached to the Hoster Decl. D.I. 11 as Ex. I.)

27. By letter dated April 8, 2002, I wrote to Mr. Bowman and Mr. Rosa. A copy of this letter is attached hereto as Exhibit F. I reported that notwithstanding NutraSweet's claims that it had ceased such sales, Ajinomoto recently had learned of a further illegal export, in this case a shipment in February 2002 to Ashdod, Israel. I also stated that in order to cure the breach cited in Dr. Kono's March 27 notice, NutraSweet was required to recall the aspartame it had improperly exported to customers in the Excluded Territory, which we understood exceeded 60 metric tons. I also proposed terms under which Ajinomoto was willing to settle the dispute. Among other things, Ajinomoto requested written confirmation from NutraSweet that it

9

understood Section 2.3 of the License Agreement to prohibit NutraSweet from participating, directly or indirectly, in the export of aspartame to the Excluded Territory.

　　　　28.　　On April 9, 2002, Dr. Morioka, Mr. Miyama and I met with Mr. Bowman and Craig Petray of NutraSweet. Mr. Hoster did not attend this meeting. In this meeting, NutraSweet confirmed that a total of 130 metric tons of aspartame had been transshipped to customers in the Excluded Territory through Vopak U.S.A. and its European affiliates. NutraSweet further confirmed that Vopak was the only customer to which NutraSweet had sold product in this manner. Mr. Bowman agreed to execute an amendment to the License Agreement that would remove any doubt that indirect exports were prohibited. Since NutraSweet said that it would be unable to recall most of the 130 metric tons that had been transshipped, we discussed the idea that Ajinomoto would be compensated for the improper sales by having NutraSweet purchase a certain amount of aspartame from Ajinomoto at a price in excess of the price specified in an existing supply agreement involving NutraSweet and Ajinomoto.

　　　　29.　　In a letter from Mr. Bowman dated April 10, 2002, NutraSweet countered with an alternative business proposal to compensate Ajinomoto. He also stated that "NSC is encouraged by and appreciates the continued efforts of Ajinomoto to resolve the dispute." A copy of this letter is attached hereto as Exhibit G.

　　　　30.　　I sent a draft of a settlement agreement to Mr. Bowman on April 12, 2002. As Mr. Bowman was on vacation, Mr. Hoster responded by letter dated April 15, 2002, in which he offered a further counterproposal on the business terms. In the opening of his letter, Mr. Hoster emphasized that "NutraSweet Company appreciates

Ajinomoto's continued efforts to resolve this dispute." A copy of this letter is attached hereto as Exhibit H.

31.  After further exchanges of drafts, the parties executed the 2002 Letter Agreement on May 1, 2002. (2002 Letter Agreement attached to the Tomioka Decl. D.I. 8 as Ex. B.)

32.  Pier records disclosed that 5.4 metric tons of aspartame had been shipped from New York to London on May 3, 2002. On August 9, 2002, I wrote to Mr. Bowman asking NutraSweet to investigate whether this was a shipment of NutraSweet manufactured aspartame. I spoke with Mr. Bowman regarding this matter by telephone on August 21, 2002. Mr. Hoster did not participate in this call. Mr. Bowman reported that Vopak denied having any involvement in this shipment. Mr. Bowman emphasized that NutraSweet wished to cooperate with Ajinomoto. I thanked Mr. Bowman for his cooperation, and noted that Ajinomoto had first conducted an investigation of the matter, and only then wrote to NutraSweet seeking information. Mr. Bowman expressed appreciation for the manner in which Ajinomoto had approached this subject. We each assured the other that the parties wanted to have a positive relationship going forward.

33.  As noted above, the discussions between Ajinomoto and NutraSweet between December 2001 and August 2002 related to actions by NutraSweet that Ajinomoto considered to be clear and serious violations of the License Agreement. Notwithstanding the strong evidence of NutraSweet's knowing participation in these exports, and the seriousness of this violation, Ajinomoto conducted extensive discussions with NutraSweet before it decided to issue a notice of breach. All of the discussions and

communications between Ajinomoto and NutraSweet were amicable and in the spirit of cooperation, and at no time did either party threaten the other with legal action.

34. This declaration should not be construed as a general waiver of any matter or communications protected by the attorney-client privilege, work product doctrine or any other applicable privilege, nor should it be construed as an intention to waive any such privilege.

35. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2005

_____
Joshua Rawson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, Peter J. Walsh, Jr., do hereby certify that on July 22, 2005, I caused copies of the foregoing DECLARATION OF JOSHUA H. RAWSON to be electronically filed with the Clerk of the Court using CM/ECF, which is available for public viewing and downloading, and which will send notification of such filing to the following counsel of record:

    James L. Holzman, Esquire (DSB ID No. 663)
    Gary F. Traynor (DSB ID No. 2131)
    J. Clayton Athey (DSB ID No. 4378)
    PRICKETT, JONES & ELLIOTT, P.A.
    1310 King Street
    Wilmington, Delaware 19801
    Email: jlholzman@prickett.com
    Email: gftraynor@prickett.com
    Email: jcathey@prickett.com

                                                  /s/ Peter J. Walsh, Jr.
                                          Peter J. Walsh, Jr. (DSB ID No. 2437)
                                          POTTER ANDERSON & CORROON LLP
                                          Hercules Plaza, 6th Floor
                                          1313 North Market Street
                                          Post Office Box 951
                                          Wilmington, Delaware 19899-0951
                                          Tel: (302) 984-6000
                                          E-mail: pwalsh@potteranderson.com

691697v1/29191