IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NUTRASWEET COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 05-318-SLR |
| AJINOMOTO CO.,INC. | ) | |
| Defendant. | ) | |

---

James L. Holzman, Esquire, Gary F. Traynor, Esquire and J. Clayton Athey, Esquire of Prickett, Jones & Elliott, PA, Wilmington, Delaware. Counsel for Plaintiff. Co-Counsel: Steven P. Handler, Esquire, David F. Wentzel, Esquire, John P. Killacky, Esquire and Jeremy A. Root, Esquire of McDermott, Will & Emery LLP, Chicago, Illinois.

Peter J. Walsh, Jr., Esquire of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendant. Co-Counsel: Matthew D. Slater, Esquire, Patricia M. McDermott, Esquire and Ilya Shapiro, Esquire of Cleary, Gottlieb, Steen & Hamilton, LLP, Washington, D.C.

---

**MEMORANDUM OPINION**

Dated: March 31, 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

The NutraSweet Company ("NutraSweet") filed the instant action against Ajinomoto Co., Inc. ("Ajinomoto") seeking a declaration that the export of aspartame manufactured in Korea in accordance with a certain process does not constitute a breach of a Release and License Agreement ("License Agreement") between the parties and that Ajinomoto may not terminate the Licence Agreement as a result of such a sale. Before the court is Ajinomoto's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction because NutraSweet did not establish an actual controversy as required by the Declaratory Judgment Act, 28 U.S.C. § 2201.

## II. BACKGROUND

NutraSweet and Ajinomoto both manufacture and sell aspartame, a type of artificial sweetener. (D.I. 1 at ¶ 2) Ajinomoto holds patents and know-how pertaining to the production of aspartame. On May 25, 2000, Ajinomoto and NutraSweet entered into a License Agreement that, in relevant part, granted to NutraSweet a "perpetual, irrevocable, royalty-free non-exclusive license and right" to use certain of Ajinomoto's "Patents and Know-How" to manufacture and sell aspartame. (D.I. 1 at ¶¶ 3, 17; D.I. 8, ex. A) The intellectual property rights covered by the License Agreement include over 150 United States and Canadian

patents and patent applications held by Ajinomoto, along with all of their foreign counterparts, and know-how regarding the manufacture of aspartame. (D.I. 1 at ¶ 18, D.I. 8, ex. A) This license and right to make, use or sell aspartame employing the identified Ajinomoto intellectual property extends worldwide, except for an "Excluded Territory" consisting of countries listed in exhibit B to the License Agreement.[1] (D.I. 1 at ¶¶ 3, 17; D.I. 8, ex. A) The License Agreement prohibits NutraSweet's export of aspartame manufactured using the licensed patents and know-how to the Excluded Territory.

Since execution of the License Agreement over five years ago, the parties have addressed issues arising from certain shipments of aspartame into Europe by NutraSweet. NutraSweet has sought, and Ajinomoto has granted, numerous exceptions to the License Agreement to permit its otherwise prohibited sale of aspartime into the Excluded Territory. (D.I. 7 at 4) In each instance, Ajinomoto discussed the issue with NutraSweet and negotiated a mutually acceptable solution without resort to legal action. (Id.)

For example, in early 2001, Ajinomoto became concerned that aspartame manufactured using its patents and know-how was being exported to the Excluded Territory. (Id.) After an

---

[1]The Excluded Territory includes the European Union and certain other countries.

investigation revealed evidence of several apparent violations of the License Agreement by NutraSweet, Ajinomoto neither terminated the License Agreement nor resorted to litigation, but rather requested a meeting with NutraSweet to discuss its concerns. (Id. at 4-5) The parties thereafter negotiated over a six month period and, as a result, entered into a Letter Agreement in May 2002 that supplemented and amended the License Agreement. (Id. at 5) Several other occasions occurred when Ajinomoto either orally or by letter agreement granted permission to NutraSweet to supply aspartamine in the Excluded Territory. (Id.) The details of these circumstances are not set out herein, but the end result is noted: In each of these prior instances, Ajinomoto did not invoke its right to terminate the License Agreement and has not invoked litigation with NutraSweet or its predecessors related to the various aspartame licensing agreements, supply agreements or joint ventures in the 35 year history of relation. (Id. at 6)

In April 2003 NutraSweet acquired from Daesang Corporation ("Daesang") certain manufacturing facilities and intellectual property located in Gunsan, Korea. (D.I. 1 at ¶ 5) The acquired assets include a process for manufacturing aspartame (the "Daesang process"), which Daesang had been using to export product to Europe and elsewhere. (Id.) In May 2005 NutraSweet filed the instant action against Ajinomoto on the same day as it

accepted a purchase order from a European customer for the delivery of aspartame into the Excluded Territory (the "European customer"). (D.I. 1 at ¶¶ 25, 26) NutraSweet contends that it plans to fill the purchase order[2] and other unspecified future orders from customers in the Excluded Territory with aspartame manufactured in Korea using the Daesang process. (Id. ¶¶ 27, 28) NutraSweet now seeks a declaratory judgment that any sale into the Excluded Territory of aspartame manufactured in Korea in accordance with the Daesang Process does not constitute a breach of the License Agreement and that Ajinomoto may not terminate the License Agreement pursuant to section 6.2 of the Agreement as a result of any such sale. (D.I. 1 at ¶¶ a, b)

**III. STANDARD OF REVIEW**

As an initial matter, the court must determine whether Federal Circuit or Third Circuit law controls this case. To determine appellate jurisdiction in this declaratory judgment context, the court must assess the future legal action that NutraSweet contends Ajinomoto might bring, not simply the complaint NutraSweet has filed. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1578 (Fed. Cir. 1993) (in determining jurisdiction under 28 U.S.C. § 1338(a), the Federal Circuit applies well-pleaded complaint rule not to the declaratory

---

[2]NutraSweet has since filled the order to the European customer.

judgment action complaint, but to the hypothetical action that declaratory judgment defendant would otherwise have brought directly against plaintiff).

The complaint states that NutraSweet plans to fill an order in the Excluded Territory under the License Agreement using the Daesang process. The only conceivable defense NutraSweet has that it is not in breach of the License Agreement is that the Daesang process does not infringe the patents in the License Agreement. In essence, NutraSweet seeks a ruling that the Daesang process does not infringe the patents or know-how covered by the License Agreement. NutraSweet alleges that it needs a declaratory judgment because it has a reasonable apprehension that, otherwise, Ajinomoto will terminate the License Agreement and sue for patent infringement.

The Federal Circuit has exclusive jurisdiction over all cases "arising under any Act of Congress relating to patents." 28 U.S.C. §§ 1295, 1338(a). Where patent law is a necessary element of an action based on contract claims, the action falls within this patent-related area of Federal Circuit jurisdiction. See U.S. Valves, Inc. v. Dray, 212 F.3d 1368, 1372 (Fed. Cir. 2000). Therefore, Federal Circuit law applies.

A declaratory judgment action may be brought in order to resolve an "actual controversy" between "interested" parties. 28 U.S.C. § 2201. As explained by the Federal Circuit in BP

Chemicals Limited v. Union Carbide Corp., 4 F.3d 975 (Fed. Cir. 1993):

> The purpose of the [Declaratory Judgment] Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action. However, the controversy must be actual, not hypothetical or of uncertain prospective occurrence. The requirement of actual controversy encompasses concepts such as ripeness, standing, and the prohibition against advisory judicial rulings--all raised in this case.

Id. at 977. In reaching its conclusion, the court must apply a totality of the circumstances standard. C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 880 (Fed. Cir. 1983). Recognizing that "[t]here is no simple rule that addresses all shades of relationships between disputants," the Federal Circuit has developed

> a pragmatic two-part test for determining declaratory justiciability. There must be both (1) an explicit threat or another action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

Id. at 978. In the present motion, only the first prong of this test is at issue. The court, therefore, confines its analysis to whether Ajinomoto's conduct has placed NutraSweet in reasonable apprehension of an infringement suit.

Although there are countless permutations of competitive

relations, the Federal Circuit has given some guidance as to what conduct constitutes commercial activity that does not meet the test for a declaratory judgment action. Certainly, "more is required than the existence of an adversely held patent." Id. Indeed, a "patentee's statement that it intend[s] to enforce [its] patent [has been] held not to create a reasonable apprehension of suit." Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051, 1054 (Fed. Cir. 1995)(discussing Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 889 (Fed. Cir. 1992)). Likewise, "[t]he offer of a patent license does not create an actual controversy . . . When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." Phillips Plastics Corp., 57 F.3d at 1053. As a general principle, then, the Federal Circuit has concluded that the objective test for determining declaratory justiciability is not met "when a patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity." Cygnus Therapeutics Sys. v. ALZA Corp., 92 F.3d 1153, 1160 (Fed. Cir. 1996).

On the other hand, the test for finding a "controversy" is a "pragmatic one and cannot turn on whether the parties used polite

terms in dealing with one another." EMC Corp. v. Norand Corp., 89 F.3d 807, 811 (Fed. Cir. 1996). "[I]n light of the subtleties in lawyer language," Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988), the Federal Circuit has not required express charges of infringement or similar "magic words" to create a justiciable controversy. Id. Courts must look to the "realities of business life" so that a patentee may not succeed in extra-judicial patent enforcement by employing ambiguous "lawyerisms" and "scare-the-customer-and-run tactics." Id. at 735-36.

**IV. DISCUSSION**

Initially, courts generally look for an explicit threat of suit. See Gen-Probe v. Vysis, Inc., 359 F.3d 1376, 1380 (Fed. Cir. 2004); Cygnus Therapeutic Sys. v. ALZA Corp., 92 F.3d 1153, 1160 (Fed. Cir. 1996)(affirming dismissal of declaratory judgment action for lack of actual controversy in the absence of an express threat to sue for infringement). Ajinomoto asserts that it has had no communication with NutraSweet concerning the planned sale of aspartame to the European customer, much less expressly or impliedly threatened to terminate the License Agreement for breach or threatened to sue for infringement.

NutraSweet points to three instances purporting to demonstrate Ajinomoto's threat of an infringement suit. First is Ajinomoto's conduct leading to the May 2002 Letter Agreement.

The 2002 Letter Agreement negotiations relate to NutraSweet's participation in the sale of aspartame in the Excluded Territory under the License Agreement. The specific facts of this alleged breach of the License Agreement are not before the court now, but, NutraSweet contends that Ajinomoto's threat of infringement as a result of these acts suffice to establish a reasonable apprehension in the current case.[3] The court disagrees. Even if NutraSweet's conduct during the time of the 2002 Letter Agreements was related to the conduct here, the record demonstrates that negotiations took place and resulted in a mutual agreement to modify the License Agreement. The court finds no evidence that NutraSweet was coerced or threatened during these negotiations. These negotiations certainly do not result in a reasonable apprehension of suit now.

Second, NutraSweet points to Ajinomoto's refusal to provide NutraSweet any assurance of its position regarding the acts of NutraSweet to export Daesang-manufactured aspartame to the Excluded Territory. While a party's refusal to give assurances not to sue may be relevant, the parties have different versions of what assurances were requested. NutraSweet's version of the facts relate that Ajinomoto, in response to a request for an assurance not to terminate the License Agreement due to

---

[3]NutraSweet contends that Ajinomoto's counsel brought up the possibility of patent infringement at one of the meetings.

NutraSweet's export of the Daesang-manufactured aspartame to the Excluded Territory, stated that NutraSweet needed a license to do so. In light of the past negotiations between the parties, the court does not find this response to be sufficient to raise a reasonable apprehension of litigation. A patent owner should not be penalized for voicing its beliefs of patent rights. See Phillips Plastics Corp., 57 F.3d at 1054.

Third, NutraSweet relies on Ajinomoto's refusal to reveal its intentions since the suit was filed. The court finds that the conduct of Ajinomoto after the complaint was filed is not relevant in determining jurisdiction. "Activities that occurred subsequent to the filing of the Complaint may not be considered since jurisdiction, if it exists, must be established as of the date of the filing of the declaratory judgment action." Millipore Corp v. University Patents, Inc., 862 F.Supp. 227, 231 (D. Del. 1987) (citing Jervis B. Webb Co v. Southern Sys. Inc., 742 F.2d 1388, 1398 (Fed. Cir. 1984)).

NutraSweet also asserts that past litigation between Ajinomoto and NutraSweet and Ajinomoto and Daesang result in a reasonable apprehension of litigation. Again, the court finds this unpersuasive. While on-going litigation between parties may be sufficiently threatening to create a reasonable apprehension necessary for an actual controversy, see Goodyear Tire & Rubber Co. v. Releaseomers, Inc., 824 F.2d 953, 954 (Fed. Cir. 1987),

the past litigation between NutraSweet and Ajinomoto did not involve the intellectual property rights involved in the License Agreement and two of the three proceedings cited by NutraSweet were initiated by NutraSweet.[4] Furthermore, none of the litigation between Daesang and Ajinomoto involved the License Agreement or the intellectual property licensed under the License Agreement and, therefore, can not result in a reasonable apprehension of litigation on the part of NutraSweet regarding the License Agreement.

**V. CONCLUSION**

For the reasons stated above, the court grants Ajinomoto's motion to dismiss for lack of subject matter jurisdiction. An order consistent with this memorandum opinion shall issue.

[4]The only proceeding initiated by Ajinomoto was an interference in the United States Patent and Trademark Office.